# Supreme Court of Florida

_____

No. SC13-718
_____

**MICHAEL A. HERNANDEZ, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC13-2330
_____

**MICHAEL A. HERNANDEZ, JR.,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[September 17, 2015]

PER CURIAM.

Michael A. Hernandez, Jr., appeals an order of the circuit court denying his

motion to vacate his conviction of first-degree murder and sentence of death filed

under Florida Rule of Criminal Procedure 3.851. He also petitions this Court for a writ of habeas corpus, alleging ineffective assistance of appellate counsel. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons explained below, we affirm the order denying postconviction relief and deny his petition for a writ of habeas corpus.

## BACKGROUND AND FACTS

Michael A. Hernandez, Jr., age twenty-three at the time of the crime, was convicted of the November 18, 2004, first-degree murder of Ruth Everett ("Everett") in Milton, Florida. Hernandez and a friend, Christopher Shawn Arnold, went to the home of Everett and her son David Everett, also known as "Snapper," from whom Arnold sometimes obtained drugs. Arnold and Hernandez went there looking for crack cocaine. When Everett answered the door and told them that her son was not home, Hernandez grabbed her and forced her into the house. Once Hernandez and Arnold were inside, Arnold demanded money and then went looking around the house for drugs. He returned, however, with a pillow, which he put over Everett's face in an attempt to smother her while Hernandez held her. During the struggle or thereafter she suffered a broken neck.

Arnold left the house with the victim's purse and Hernandez then stabbed her in the neck. Hernandez returned to the car with blood on his clothes, and he and Arnold drove away. They used her ATM card several times to withdraw money which they used to buy crack cocaine.

The evidence presented at trial showed that Hernandez's former stepfather Richard Hartman, Sr., his wife Tammy Hartman, and Arnold's girlfriend Michelle Rose, who is Tammy Hartman's daughter, were told by Arnold about the murder. Richard and Tammy then went to Hernandez's home and confronted him.[1] Subsequently, both Arnold and Hernandez turned themselves in to police and gave statements. Hernandez was indicted for one count of first-degree premeditated or felony murder while carrying a knife and one count of robbery with a deadly weapon. He was later also charged with burglary with an assault or battery. Arnold, who was also charged, entered a plea and received a sentence of life in prison and Hernandez proceeded to trial. At trial, the medical examiner testified that Everett died from the combined effects of blunt and sharp force injuries to the

---

1. Hernandez is the son of Richard Hartman's former wife Cheryl and Michael Hernandez, Sr.

neck, and that either the broken neck with laceration of the spinal cord or the slash through her neck could have been fatal, but also could have been survivable if medical help had been summoned. Hernandez was convicted on February 6, 2007, of all three counts.

At the penalty phase proceeding, the defense called two family members and two mental health experts to present evidence in mitigation, including statutory mental health mitigation. The State presented evidence of statutory aggravation and also presented its own expert, Dr. Harry McClaren, who disagreed that statutory mental health mitigation was present. The jury recommended death by a vote of eleven to one and a Spencer[2] hearing was held before sentencing. On March 22, 2007, the trial court entered an order sentencing Hernandez to death, finding four aggravating circumstances and giving each great weight, as follows: (1) the defendant was convicted of prior violent felonies (§ 921.141(5)(b), Fla. Stat. (2007)); (2) the murder was committed during a robbery with a deadly weapon and a burglary of an occupied dwelling with an assault or battery while

---

2. Spencer v. State, 615 So. 2d 688 (Fla. 1993) (providing for a hearing after trial at which the parties may present to the sentencing judge any additional information or evidence pertinent to the appropriate sentence to be imposed and to afford the defendant an opportunity to be heard in person).

armed with a dangerous weapon (§ 921.141(5)(d), Fla. Stat. (2007)); (3) the murder was committed to avoid or prevent a lawful arrest (§ 921.141(5)(e), Fla. Stat. (2007)); and (4) the murder was especially heinous, atrocious, or cruel (HAC) (§ 921.141(5)(h), Fla. Stat. (2007)). The trial court rejected the statutory mental health mitigators that the murder was committed while Hernandez was under the influence of extreme mental or emotional disturbance (section 921.141(6)(b), Florida Statutes (2007)), and that Hernandez's capacity to appreciate the criminality of his conduct or conform his conduct to the law was substantially impaired (section 921.141(6)(f), Florida Statutes (2007)). The trial court did find the statutory mitigator of lack of significant criminal history and gave it some weight. See § 921.141(6)(a), Fla. Stat. (2007). The trial court also found nonstatutory mitigating circumstances, which were given varying degrees of weight.[3] See § 921.141(6)(h), Fla. Stat. (2007).

---

3. Hernandez offered twenty-eight mitigating circumstances, and the court added a twenty-ninth, and found the following: (1) dysfunctional, neglectful, and impoverished childhood (some weight); (2) no normal family home, no regular schooling, parents were separated, abusive foster homes, and abandonment (substantial weight); (3) his parents were outlaws, motorcycle gang members, hard drug dealers and abusers, who were under threat of death from the motorcycle gang (substantial weight); (4) his parents introduced him to narcotics at an early age (substantial weight); (5) his mother's live-in paramours were physically, mentally, and emotionally abusive to her and to defendant (some weight); (6) he witnessed physical abuse of his mother on many occasions (some weight); (7) he was abandoned by his mother on more than several occasions (substantial weight); (8) his father fatally overdosed on drugs at the hands of a girlfriend while

On direct appeal, Hernandez raised eight claims,[4] and this Court also decided sufficiency of the evidence and proportionality. We affirmed in

defendant was living with him (some weight); (9) defendant was mentally, physically, emotionally, and sexually abused in foster care over a four year period as a pre-teen/early teen (some weight); (10) he ran away from a foster home because of abuse and because his mother would not come to his aid and told him she was going to commit suicide (some weight); (11) he was dysfunctional and began to live on the streets and continued to use drugs (some weight); (12) he lived with his half-brother for a period of time, but was subjected to continued drug exposure and use at the hands of his half-brother's father, Richard Hartman (some weight); (13) when he did attend school he was in learning disabled classes (some weight); (14) he was able to marry and support his family for two years (some weight); (15) he was characterized as a loving person, loving father, and husband (some weight); (16) he has a life-long addiction to controlled substances due to his involuntary exposure to them at an early age (some weight); (17) he was enticed into bingeing on cocaine at the time of the instant offense by the codefendant (not proven; no weight); (18) he had been drinking the night before and was still under the influence of alcohol on the morning of the offense (some weight); (19) the offense was unplanned and was initiated by the codefendant (not proven; no weight); (20) the homicide was a spontaneous, unplanned act (not proven; no weight); (21) the codefendant took the property of the decedent in hopes of finding money or means to get money to purchase cocaine (not mitigating; no weight); (22) when confronted, the defendant accepted responsibility for taking part in the offense (substantial weight); (23) he has continuously shown remorse for his conduct (slight weight); (24) he has cooperated with the police (some weight); (25) he has attempted suicide (some weight); (26) the codefendant was offered a life sentence and was equally culpable, and actually initiated the entire episode (not mitigating; no weight); (27) the defendant is not worthy of the death penalty for his participation in this crime (argumentative; no weight); (28) he has mental and cognitive disorders that do not qualify as statutory mitigating circumstances (some weight); and (29) his family members have attested to his good character (some weight).

4. The claims raised on direct appeal by Hernandez were: (1) trial court error in failing to strike the venire and failing to declare a mistrial after one prospective juror saw Hernandez in shackles, although that juror was excused for cause; (2) trial court error in refusing to excuse juror L for cause due to her

Hernandez v. State, 4 So. 3d 642 (Fla. 2009), and in the opinion, we recounted

Hernandez's statement given to law enforcement shortly after the murder as

follows:

> According to Hernandez's statements, the following events occurred on November 18 and 19, 2004. Hernandez left his house at 8:30 a.m. on November 18 to go to work, but he and [Shawn] Arnold instead "went to a crack friend's house and got some crack . . . with the gas money and cigarette money [Hernandez] had for the day." Although he had used crack before moving to Florida, Hernandez had not used it since moving to Florida. They were "doing crack," and Arnold suggested going to the house of "Snapper," an individual whom Arnold knew. Arnold had done cocaine with "Snapper" before, but Hernandez did not know him. Arnold told him "he was going to try and get some money." Hernandez and Arnold drove to "Snapper's" house in Arnold's car. They went to the door and spoke with an "old lady" at the house. Arnold told Hernandez to "grab her," and Hernandez grabbed the lady by the mouth and pulled her into the house. Hernandez "got her quiet" and told her, "shh, calm down, calm down. We ain't going to hurt you." The lady sat down in a chair. Arnold told the lady that "Snapper" owed him $300 and that Arnold had a gun put to his head over this money. Arnold had made up this story. Arnold told her that they would try to get the money from her and that they would leave her son alone if they got the money. The lady told them that all she had was $20. Arnold said, "All right," and then asked to use the bathroom and came back with a

---

personal encounters with substance abuse problems in her family and her contacts with law enforcement; (3) trial court error in excusing Dr. McClaren, the State's mental health expert, from the rule of sequestration during both lay and expert testimony in the penalty phase; (4) trial court error in failing to dismiss the indictment, which did not allege aggravating circumstances, and failing to require specific jury findings regarding aggravators; (5) trial court error in giving the jury instruction on victim impact evidence; (6) trial court error in finding the avoid arrest aggravator; (7) trial court error in finding the HAC aggravator; and (8) disparate sentence given because codefendant Arnold received life in prison after pleading nolo contendere and Hernandez received death.

pillow. Arnold stuck the pillow over the lady's face while she was still in the chair. Arnold told Hernandez to grab the lady's hands, and Hernandez did. Hernandez and Arnold were "suffocating her" and she was "struggling." While Hernandez and Arnold were "choking her," "she stopped moving for a minute." Hernandez said the following then occurred: "And we let her up and tried to drag her over to the couch and lay her down. And she drops, and I go to grab her, and I grab her head. And her head cracked. And Shawn helped me get her on the couch. And I . . . got the knife from him and cut her neck . . . . After she was dead." Hernandez had grabbed Arnold's pocket knife before entering the house and had used it to "chop up a crack block earlier." Hernandez said he did not know why he cut the lady's neck.

Hernandez, 4 So. 3d at 649-50. In affirming, the majority of the Court found that the claims were without merit, the evidence was sufficient, and the sentence was proportionate.[5] The United States Supreme Court denied certiorari in Hernandez v. Florida, 558 U.S. 860 (2009).

**Postconviction Proceedings**

Hernandez filed his initial motion for postconviction relief under Florida Rule of Criminal Procedure 3.851 in September 2010 in the circuit court of Santa Rosa County. The motion alleged ineffective assistance of lead trial counsel Ted

---

5. Justice Pariente concurred in result only with an opinion in which Justices Lewis and Quince concurred. Justice Pariente agreed that the conviction and sentence should be affirmed but concluded that the trial court abused its discretion in allowing the State's expert, Dr. McClaren, to remain in the courtroom during the testimony of the defense's penalty phase witnesses, although she found the error harmless beyond a reasonable doubt. Id. at 674-75 (Pariente, J., concurring in result only).

Stokes and lead penalty phase counsel Michael Rollo.[6]  The motion also alleged a

Brady/Giglio claim.[7]

---

6. In claim one of the motion, Hernandez contended that he was denied adequate adversarial testing in the guilt and penalty phases and was denied adequate investigation, preparation, and presentation of a defense case in the following respects: (A) trial counsel declined the opportunity to select a jury in a manner that would allow counsel to save a peremptory challenge for a specific juror; (B) trial counsel failed to object to incriminating testimony of Hernandez's wife on the grounds of marital privilege; (C) trial counsel failed to investigate or prepare a meaningful challenge to testimony of Tammy Hartman; (D) trial counsel failed to preserve for appeal the issue of Tammy's daughter's unsolicited testimony that Hernandez threatened to kill someone the night after the murder; (E) trial counsel failed to object to overbroad victim impact testimony and elicited testimony critical of the victim; (F) trial counsel failed to investigate or prepare to challenge the evidence in support of the prior violent felony aggravator; (G) trial counsel failed to ensure that Hernandez and Shawn Arnold were separated following their arrests and incarceration; (H) trial counsel failed to sufficiently develop evidence that the victim's neck was likely broken by Arnold when he was trying to smother the victim; (I) trial counsel failed to object to improper prosecutorial argument, failed to develop a coherent theory in the guilt phase, failed to coordinate the guilt phase presentation with the penalty phase presentation, failed to recognize the impact of guilt phase evidence on the penalty phase, and failed to realize that poorly-conceived denial as a defense can increase the likelihood of a death sentence; (J) trial counsel performed an inadequate investigation and presentation of Hernandez's personal and family background and improperly allowed the State's expert witness to observe the penalty phase testimony; and (K) penalty phase counsel failed to prepare his mental health experts and failed to obtain and present adequate mental health mitigation.

In claim two, Hernandez claimed that the State withheld material and exculpatory evidence in violation of Brady, and presented false and misleading evidence in violation of Giglio, regarding, in part, the testimony of Tammy Hartman.  By agreement of the parties during the evidentiary hearing, a claim was added that trial counsel was ineffective in failing to argue that Hernandez was told he would not be given the death penalty if he surrendered.

7. Brady v. Maryland, 373 U.S. 83 (1963) (when favorable, material evidence is willfully or inadvertently not disclosed by the government); Giglio v.

A case management conference was held on February 25, 2011, and the circuit court entered an order granting an evidentiary hearing on most of the subclaims raised in claim one of the motion and on the Brady claim raised in claim two of the motion. The claims raised in claim one, subclaims A and G, and the Giglio claim raised in claim two were denied by the court without an evidentiary hearing. The circuit court held an evidentiary hearing in four different sessions, on January 9-13, 2012; May 25, 2012; July 16, 2012; and July 25, 2012, and denied postconviction relief on all claims in an order entered on March 28, 2013. Thus, the court denied the Defendant's Motion to Vacate Conviction and Sentence in its entirety, although not all of those claims have been appealed here. Because most of the postconviction claims contend that trial counsel was ineffective in representation of Hernandez in either the guilt phase or the penalty phase, the standard of review for those claims is set forth next.

**Standard of Review for Claims of Ineffective Assistance of Counsel**

Pursuant to the Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), two requirements must be satisfied to establish ineffective assistance of counsel:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably

United States, 405 U.S. 150 (1972) (when prosecution presents or fails to correct false, material testimony that the prosecutor knew was false).

competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. Strickland v. Washington, 466 U.S. 668 (1984); Downs v. State, 453 So. 2d 1102 (Fla. 1984). A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.

Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986). Because both prongs of Strickland present mixed questions of law and fact, this Court employs a mixed standard of review. The Court will defer to the circuit court's factual findings that are supported by competent, substantial evidence, and will review the circuit court's application of the law to those facts de novo. See Johnson v. State, 135 So. 3d 1002, 1013 (Fla. 2014). There is a strong presumption that trial counsel's conduct falls within the "wide range of reasonable professional assistance," and "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Deparvine v. State, 146 So. 3d 1071, 1097 (Fla. 2014) (quoting Strickland, 466 U.S. at 689). "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). The defendant must "overcome the presumption that, under the circumstances, the challenged

action 'might be considered sound trial strategy.' " Deparvine, 146 So. 3d at 1083 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Strickland, 466 U.S. at 691.

Under the prejudice prong of Strickland, the defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." White v. State, 964 So. 2d 1278, 1285 (Fla. 2007) (quoting Strickland, 466 U.S. at 694). Importantly, that reasonable probability is one "sufficient to undermine confidence in the outcome." Id. Where the defendant claims that counsel provided ineffective assistance in the penalty phase, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." State v. Woodel, 145 So. 3d 782, 798 (Fla. 2014) (quoting Sochor v. State, 883 So. 2d 766, 771 (Fla. 2004) (quoting Strickland, 466 U.S. at 695)), cert. denied, 135 S. Ct. 1735 (2015). As we reiterated in Foster v. State, 132 So. 3d 40 (Fla. 2013), a defendant is not required "to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.' " Id. at 52 (quoting Porter v. McCollum, 558 U.S. 30, 44 (2009) (quoting Strickland, 466 U.S. at 693-94)).

- 12 -

Within this framework, we turn to the claim that trial counsel was ineffective in handling the testimony of Tammy Hartman.

## ANALYSIS

### Testimony of Tammy Hartman

Hernandez first contends that trial counsel was ineffective in failing to investigate and develop a meaningful challenge to the testimony of Tammy Hartman ("Tammy"). Hernandez argues, as he did below, that reasonably competent counsel would have investigated her pretrial statements and been prepared to cross-examine her in detail about certain inconsistencies between her pretrial statements, her deposition, and her trial testimony. Hernandez also claims that counsel should have moved to exclude any of her testimony that related what Arnold told her, as opposed to what Hernandez told her—and that when she expressed confusion over which one told her, counsel should have objected based on hearsay.

Hernandez cites several examples of Tammy's testimony that he contends trial counsel should have impeached as inconsistent or objected to as inadmissible hearsay. For example, he cites Tammy's trial testimony that Hernandez told her Arnold tried to revive the victim by having her breathe into a bag after Arnold tried to smother her with the pillow. She amended that testimony by noting that it might have been Arnold who told her that. This trial testimony was also in conflict with

her first statement to police, and Arnold's deposition, which indicate that Arnold gave a bag to the victim to breathe into before the smothering incident began. In another example, Hernandez contends that counsel was deficient in failing to object to hearsay when Tammy testified she was not sure who told her that Arnold complained to Hernandez at the time of the incident that they "weren't going to do this." Hernandez cited other specific examples of testimony he contends counsel should have impeached or to which he should have objected. The postconviction court denied the claim, finding that counsel did object to hearsay statements told to her by Arnold, that he did obtain a copy of her deposition and read it before she testified, and that it was trial counsel's reasonable strategy to allow Tammy to show she was confused and inconsistent in her testimony.

Without doubt, Tammy's trial testimony was sometimes inconsistent with earlier statements and was often confused. In fact, trial counsel Stokes testified at the evidentiary hearing that it was his strategy to use her confusion to argue that "she did not know what she was talking about" and, thus, her testimony was not reliable. Stokes explained that it was also his trial strategy to show that Tammy was partial to Arnold because he was the father of her granddaughter, and that "we weren't so concerned with her inconsistencies as we were her motivation." Hernandez also argues that trial counsel should have attempted to present Arnold to testify because his deposition and evidentiary hearing testimony showed

conflicts with some of Tammy's testimony. Even if counsel should have objected to more of her testimony when it was inconsistent with earlier statements or when she was not sure if the facts she was testifying to were told to her by Arnold or Hernandez, prejudice has not been shown. Nor was prejudice shown in counsel's failure to secure Arnold's trial testimony.

First, Tammy's testimony was consistent that Hernandez told her he initially had the victim in a choke hold and that he slit the victim's throat because she would not die. Further, much of what Tammy testified to was confirmed in the statement Hernandez gave police soon after the murder. Moreover, we agree with the postconviction court that Tammy's confused testimony was more helpful to Hernandez than Arnold's deposition testimony. After entering his plea in this murder, Arnold gave a May 25, 2006, deposition, prior to Hernandez's trial, taken by Hernandez's first attorney. Arnold testified that when they went to the victim's home looking for David Everett and found he was not home, Hernandez pushed the victim into the house into a recliner chair. Arnold testified in his deposition that he went in and Hernandez had the victim in "a neck hold sort of kind of pushing on her neck." He further testified that he told Hernandez, "Come on, don't do this" and that Hernandez released the victim, who was still in the recliner and was hysterical. Arnold said that is when he gave the victim the bag to breathe into because she was very upset as he was asking her where her son was. Arnold said

the victim was still in the recliner, and did calm down some. Arnold said he asked to use the bathroom, but came back with a pillow which he "put . . . over Ms. Everett's head. . . . over her face." Arnold testified that when he did that, Hernandez had his hands around the victim's throat.

Arnold also testified in his deposition that when he pulled the pillow off the victim's face and announced he "could not do this," Hernandez asked him to hold her arms because she was struggling. Arnold then said Hernandez "grabbed her [by her head] and sort of slung her onto the floor. . . . Pulled her out of the chair and slung her on the floor." Arnold testified that he took the pillow and her purse and left. He also testified that when Hernandez returned to the car, he had blood on his clothes and told him he had stabbed the victim in the neck because he wanted to make sure she was dead. The sworn statement Arnold gave on November 19, 2004, the day after the murder, was consistent in most respects with this later deposition. Postconviction counsel also contends that if trial counsel had questioned Arnold prior to trial, he could have used his testimony to dispute Tammy's testimony that Hernandez knocked Arnold out of the way after Arnold said they "weren't going to do this." Arnold testified at the evidentiary hearing that it was the action of the recliner after Hernandez jumped on it during the smothering incident that knocked Arnold back against the wall. Because Arnold's pretrial statement to police and his deposition taken before trial show he did not

- 16 -

address the issue of being knocked aside—either by Hernandez or by the action of the recliner, the claim that counsel could have obtained this testimony to dispute Tammy's version is speculative.

Even if some of his testimony could have disputed portions of Tammy's version of events, the overall effect of his testimony would have been more damaging to Hernandez's defense than Tammy's confused and inconsistent testimony. Further, postconviction counsel did not establish that Arnold would have testified at Hernandez's trial. Arnold testified at the evidentiary hearing that he had advised his attorney that he was not going to testify at Hernandez's trial, and trial counsel also believed that if Arnold had been forced to testify at trial, his testimony would not have been helpful to Hernandez. Even if counsel was deficient in several minor respects in failing to bring out discrepancies in portions of Tammy's testimony, or discrepancies between her testimony and Arnold's, prejudice has not been shown. Hernandez's own confession disclosed that he forced the victim into the house and into the recliner, he held her while Arnold tried to smother her, he grabbed the victim's head and felt a snap, and he cut the victim's neck after Arnold left.

Hernandez also argues briefly in this appeal that Stokes should have retained an expert such as Dr. Leroy Riddick, a medical examiner, who testified in the evidentiary hearing that the victim's neck was not broken by "a violent twisting" as

- 17 -

Tammy had testified Hernandez reported having done. Dr. Riddick testified at the hearing that of three hypothetical scenarios—where the neck was broken by twisting, by having the head pushed back by force with the pillow, and by the head hitting the floor—the "most reasonable would be the pillow with a lot of force being pushed against her face" and that due to spinal shock and lack of oxygen, she "could" have been "brain dead" at that point. Postconviction counsel contends that this type of testimony would have shown that the victim's neck was broken when the pillow was forcefully pushed against her face by Arnold, and that she "could have been" brain dead, but with a beating heart, before Hernandez cut her throat and she bled profusely. However, on cross-examination at the evidentiary hearing, Dr. Riddick stated that he did not disagree with any of the testimony and opinions of Dr. Andrea Minyard, the medical examiner who testified at trial. He also agreed that the victim's neck could have broken when Hernandez was "manhandling" her head, as Hernandez stated in his confession.

Furthermore, the jury did hear from Dr. Minyard that the victim's neck could have been broken by having her head forced back by the pillow when she was in the recliner or when her head hit the floor when she was dropped.[8]

_____

8. Dr. Minyard testified at trial that the victim had bruising all over her face and her gums caused by hard pressure by a soft surface on her face. Dr. Minyard also testified that the victim could have died from suffocation by a pillow, but that if the victim had died from suffocation, she would not have bled so much when her throat was cut. Dr. Minyard testified that the victim had a fractured fifth vertebrae

Dr. Minyard testified that the victim was not dead, however, when the knife cut was made to her neck because, had she been dead, she would not have bled so much. Trial counsel did argue to the jury in closing that Dr. Minyard testified the broken neck could have resulted from Arnold forcefully smothering her with the pillow. Trial counsel also argued that the evidence showed Hernandez thought the victim was dead after Arnold smothered her and that when they went to move her, she was accidentally dropped and could have broken her neck then, according to the medical examiner. Thus, trial counsel was not deficient in failing to call an independent medical expert to say that the twisting motion to the victim's neck that Tammy testified about could not have caused the injury. The jury heard testimony and argument that would have allowed them to conclude the victim's neck was broken while Arnold was attempting to forcefully suffocate her. Trial counsel argued that is how it most likely occurred and no deficiency has been shown.

---

in her neck and a laceration to the spinal cord inside the vertebrae. When asked if the broken vertebrae in the victim's neck was consistent with the head being twisted, she testified, "Any upward motion would be consistent, if it's a twist, if it's straight up, it really wouldn't matter, but the upward motion is why it is important." On cross-examination, Dr. Minyard testified that the vertebrae in the victim's neck could have been broken by being forced backward during the suffocation in the recliner chair. Dr. Minyard also agreed on cross-examination that the broken neck could have occurred when the victim was dropped on the floor.

As to the claim that trial counsel was deficient in failing to object to Tammy's testimony based on hearsay when she expressed uncertainty if certain statements were made by Arnold or by Hernandez, prejudice has not been demonstrated. Hernandez's sworn statement to Detective Shuler given on November 19, 2004, admitted the main points of the attack and the murder. From Hernandez's own statement it can be seen that even though it was Arnold's idea to go to Everett's house, it was Hernandez who forced the victim into the home by grabbing her throat and mouth; it was Hernandez who pushed her into the recliner; and it was Hernandez who helped subdue her and was "choking her" while Arnold was attempting to smother her. By his own statement, Hernandez told police that when Everett ended up on the floor, he picked her up or dragged her by the head and heard something snap, and that after Arnold left, Hernandez stabbed the victim in the throat. Hernandez said in his statement that Arnold helped him get her to the couch and that after Arnold left with her purse and the pillow, Hernandez took the knife that he had obtained earlier from Arnold to chop up crack and "stuck her in the neck" with it. These statements by Hernandez were consistent with some of the most harmful aspects of Tammy's testimony, and objections to her testimony when she related events that she thought either Arnold or Hernandez told her, even if sustained, would not have overcome the damaging effects of Hernandez's own statements to police. Further, it would have been clear to the jury from the totality

- 20 -

of Tammy's testimony and Stokes' closing argument that she was confused in her recitation of events and that she favored Arnold, who was the father of her grandchild.

Under the prejudice prong of Strickland, the defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." White, 964 So. 2d at 1285 (quoting Strickland, 466 U.S. at 694). A reasonable probability is one that is "sufficient to undermine confidence in the outcome." Id. Even if trial counsel was deficient in failing to impeach Tammy's testimony by showing each inconsistency, and failing to object to hearsay every time Tammy was unsure which defendant told her the facts she was relating, such are insufficient to undermine this Court's confidence in the guilty verdict and the sentence. For all these reasons, the postconviction court's denial of this claim is affirmed.

### Giglio Claim Concerning Tammy Hartman's Testimony

Hernandez also contends that the prosecutor presented testimony of Tammy Hartman about numerous statements she attributed to Hernandez, but knew at the time that Tammy had been inconsistent about whether it was Hernandez or Arnold who made the statements. In earlier statements, Tammy had identified Arnold as the source of some of the statements, not Hernandez. He argues that the prosecutor refreshed her recollection in one instance using a portion of her pretrial deposition

when he knew that she said something contrary on a later page of her deposition. Hernandez contends that this amounts to presentation of testimony that the prosecutor knew was untrue, and thus violates Giglio v. United States, 405 U.S. 150 (1972).

We have explained, as the Supreme Court held in Giglio, that a violation occurs if (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. Foster, 132 So. 3d at 64. If the first two elements are proven, materiality is presumed and the State must prove that there is no reasonable possibility that the testimony affected the verdict because it was harmless beyond a reasonable doubt. Conahan v. State, 118 So. 3d 718, 728 (Fla. 2013). The Court applies a mixed standard of review, deferring to the trial court's findings of fact that are supported by competent, substantial evidence and reviewing de novo the application of the law to those facts. Id. at 729.

The postconviction court denied the claim, finding that Hernandez failed to prove that Tammy Hartman's trial testimony was false. The court based this finding in part on the fact that Tammy's evidentiary hearing testimony did not show that her trial testimony was false, but showed only that she was confused over who told her certain things. The court concluded that confusion is not the equivalent of a Giglio violation. We agree. The circuit court also found that

Hernandez failed to prove that the prosecutor knew any of Tammy's testimony was false, especially where other witnesses corroborated much of her testimony.

At the evidentiary hearing, the trial prosecutor testified that he had no reason to believe Tammy's trial testimony was false. He testified, "There's no statement that she's made that I could look at and say, I know that statement is false." He explained that she was a witness who had great difficulty giving specific testimony about her recollections. He agreed there were inconsistencies in her statements made in her deposition and between her trial testimony and portions of the deposition. He also noted that she said several times she could not recall whether Arnold or Hernandez had told her certain things, but that if any of her trial testimony was in fact false, he did not knowingly present it.

Citing page thirty-five of the deposition, the prosecutor was asked at the evidentiary hearing about why he did not refresh Tammy's recollection at trial with that part of her deposition concerning whether Hernandez told her he "knocked Shawn back" during the attack. The prosecutor agreed that he did not bring to Tammy's attention, or to the attention of defense counsel, Tammy's statements on page forty-two of the same deposition. There, Tammy had testified, "I want to say that Shawn told me that Michael knocked him back, but I don't know if Michael told me that or Shawn told me that." In the deposition excerpt on page forty-two, the prosecutor cautioned Tammy, "If you're not sure, I don't want you to tell me,"

to which she responded, "I don't know then." The fact that Tammy gave two inconsistent statements in her deposition and was asked about only one of them at trial does not prove that the trial testimony was false. She admitted that she did not recall whether Arnold or Hernandez told her; thus, either version could have been true—and no evidence has been provided to conclusively establish which version is the true one. Hernandez does not cite any other specific examples of alleged false testimony but makes reference generally to inconsistencies in her various statements.

Even though Tammy's testimony and her earlier statements and deposition demonstrate that there were inconsistencies, and some confusion in her rendition of events, such "mere inconsistences" have been held insufficient to establish a <u>Giglio</u> violation. <u>See</u> <u>Franqui v. State</u>, 59 So. 3d 82, 104-06 (Fla. 2011); <u>Maharaj v. State</u>, 778 So. 2d 944, 956 (Fla. 2000) (citing <u>United States v. Bailey</u>, 123 F.3d 1381, 1395-96 (11th Cir. 1997)). "[A] challenge to evidence through another witness or prior inconsistent statements [is] insufficient to establish prosecutorial use of false testimony." <u>United States v. Martin</u>, 59 F.3d 767, 770 (8th Cir. 1995) (bracketed material added) (quoting <u>United States v. White</u>, 724 F.2d 714, 717 (8th Cir. 1984). "[M]ere differences in testimony found in witness statements made at different times, or between witnesses on the same subject, are not alone sufficient to show perjury." <u>Ferguson v. State</u>, 101 So. 3d 895, 897 (Fla. 2012). <u>See also</u>

Barwick v. State, 88 So. 3d 85, 104-05 (Fla. 2011) (finding that witness's description of events at different trials represented reinterpretation of facts, not false testimony); Ferrell v. State, 29 So. 3d 959, 978 (Fla. 2010) (finding no Giglio violation merely on showing that two witnesses contradict each other.). "In the Giglio context, the suggestion that a statement may have been false is simply insufficient; the defendant must conclusively show that the statement was actually false." Maharaj v. Sec'y Dept. of Corrs., 432 F.3d 1292, 1313 (11th Cir. 2005) (citing Moon v. Head, 285 F.3d 1301, 1315 (11th Cir. 2002), and Brown v. Head, 272 F.3d 1308, 1317-18 (11th Cir. 2001)).

The most that can be said is that Tammy Hartman gave inconsistent versions of several things she thinks she was told either by Arnold or Hernandez, and that she admitted at trial and in her deposition that she could not recall the exact details of some of the conversations. However, this does not prove that the version the prosecutor presented at trial was actually false. The fact that a different version may have been marginally more favorable to Hernandez's theory of defense or mitigation does not make the trial version of Tammy's testimony false. Nor does it establish prejudice. Whether Hernandez or Arnold told her that Hernandez knocked Arnold back after he expressed a desire not to go forward with the murder did not change the fact that Arnold left the home before the victim was killed, and Hernandez went forward with cutting the victim's throat. Moreover, Tammy is not

the only witness that testified Hernandez cut the victim's throat. Hernandez confessed to cutting her throat in his statement to police. His wife, Stephanie, and Tiffany Telin also heard and testified about his statement. Because Hernandez has failed to establish that any of Tammy Hartman's testimony was actually false, and has failed to demonstrate that the prosecutor knowingly presented false evidence, his Giglio claim fails and was properly denied by the postconviction court.

### Trial Counsel's Performance Regarding Aggravating Circumstances

Hernandez next raises three claims of ineffective assistance of penalty phase counsel in regard to the evidence of aggravation. We discuss each in turn.

**1. The conviction for battery on a jail detainee**.

Hernandez contends that penalty phase counsel was deficient in preparing to rebut the State's evidence of prior violent felony convictions offered as aggravation. The State first presented evidence that Hernandez was convicted of battery on a jail detainee, Shawn Arnold, which occurred while the two were in jail after their arrests. Battery by a jail detainee on another jail detainee is a third-degree felony.[9] Hernandez contends that because penalty phase counsel did not

---

9. Section 784.082(3), Florida Statutes (2007), provides in pertinent part that whenever a person who is being detained in a prison, jail, or other detention facility is charged with a battery upon any visitor to the facility or upon another detainee in the facility, the offense of battery is reclassified to a felony of the third degree. § 784.082(3), Fla. Stat. (2007).

familiarize himself with the trial of this charge, he was not prepared to rebut the penalty phase testimony of Deputy Matthew Bartley that he saw Hernandez "strangling" Arnold in their shared cell. Hernandez also contends that had counsel reviewed the medical records for Arnold's injury, he could have shown that Arnold had no neck injury; and that counsel should have presented Arnold to testify that Hernandez did not "strangle" him. Finally, Hernandez contends that if counsel had properly prepared to challenge this aggravator, he would have realized that the copy of the judgment of conviction that was entered into evidence stated that Hernandez had also been charged with attempted first-degree murder—a charge on which the jury could not reach a verdict. After the verdict on battery on a jail detainee was entered, the State entered a nolle prosequi on the attempted murder charge. Hernandez contends that although the judgment mentioned that the State had entered a nolle prosequi, the document was still confusing as to whether Hernandez was also convicted of attempted first-degree murder.

The circuit court denied relief on this claim, finding prejudice was not shown because the prosecutor made clear in the penalty phase that the conviction was for battery on a jail detainee, and that even if the judgment had been redacted to remove any reference to the charge of attempted first-degree murder, the jury would still have heard the details of the crime from Deputy Bartley. We agree. The court also denied relief on the claim that counsel should have objected to

- 27 -

Deputy Bartley's testimony that he saw Hernandez "strangling" Arnold. First, the court correctly noted that Deputy Bartley did not use the word "strangling" in his testimony and said only that he saw Hernandez and Arnold "wrestling around" and Hernandez "squeezing" Arnold's throat. Second, the circuit court noted that the prosecutor did not use the term "strangling" in his closing argument but referred to the fact that Hernandez had his hands around Arnold's neck. The postconviction court also found that Deputy Bartley's testimony that he saw Hernandez squeezing Arnold's neck and blood on Arnold's face was not refuted by the medical records. The court noted that, at the evidentiary hearing, Arnold testified he was asleep when the attack began and did not know if Hernandez had his hands on his neck.

The circuit court was correct in denying relief on this claim based on Hernandez's failure to demonstrate prejudice. Penalty phase counsel should have sought redaction of the reference in the judgment to the fact that Hernandez was originally charged with both attempted first-degree murder and battery upon a jail detainee. However, the judgment entered into evidence did indicate, immediately below reference to attempted first-degree murder, the phrase "nol prossed 9-18-06." Moreover, the prosecutor only argued to the jury that Hernandez had been convicted of "battery upon a jail visitor or detainee." Even if the judgment had been redacted, there were no grounds to exclude Deputy Bartley's description of what he witnessed. And, the jury also had before it a conviction for a separate

- 28 -

prior violent felony, which is sufficient to support the prior violent felony aggravator found by the trial court at sentencing. For these reasons, Hernandez failed to meet the second prong of Strickland and relief was properly denied.

**2. The conviction for battery on a law enforcement officer.**

Hernandez also contends that trial counsel was deficient in failing to familiarize himself with Hernandez's separate trial on charges that he committed aggravated battery on a law enforcement officer. Thus, he contends, counsel was unprepared to rebut the jury's belief in the penalty phase that Hernandez was convicted of aggravated battery "with great bodily harm." At the penalty phase, the State presented, as evidence of a prior violent felony conviction aggravator, Hernandez's judgment of conviction for an aggravated battery on Deputy John Wade Jarvis. Deputy Jarvis testified that when Hernandez was in jail prior to the trial in this case, the deputy transported him to the office of a Dr. Larson for an evaluation. Deputy Jarvis removed Hernandez's handcuffs and waist chain at the request of the doctor's staff, but Hernandez still had on ankle shackles. About an hour into the evaluation, Hernandez was escorted to the restroom without incident. About ninety minutes later, he was escorted to the restroom again and Deputy Jarvis waited outside the door. Deputy Jarvis testified that Hernandez opened the door and when Deputy Jarvis glanced away, Hernandez hit him on the head with the ceramic toilet tank lid, which shattered on impact. Deputy Jarvis then

struggled with Hernandez until he was subdued and another deputy had a Taser aimed at Hernandez. When asked to describe his injuries, Deputy Jarvis said he "was scraped up, little small lacerations, and of course a big knot on my head." The trial court admitted into evidence at the penalty phase, without objection, a copy of the judgment of conviction, which stated that Hernandez was convicted of "aggravated battery on a law enforcement officer with great bodily harm and with a weapon."

Hernandez points out that the jury verdict in the aggravated battery trial found him guilty of aggravated battery on Deputy Jarvis with a "deadly weapon" and only "slight injury." (Emphases added). Hernandez contends that trial counsel was deficient in failing to inform the penalty phase jury that the verdict did not find "great bodily harm." The postconviction court denied the claim, stating that it would have been clear to the penalty phase jury, based on his testimony, that Deputy Jarvis did not suffer great bodily harm; thus, no prejudice has been shown. The postconviction court also found no prejudice had been demonstrated because, in light of the other aggravators, there was no reasonable probability of a life sentence even if the jury's verdict in the battery trial had been shown to the jury.

As the State points out, there are two forms of aggravated battery—one involving great bodily harm and one involving a deadly weapon. See § 784.045(1)(a), Fla. Stat. (2007). The jury found the heavy porcelain toilet lid

was a deadly weapon but found only slight injury. On this basis, Hernandez was convicted of aggravated battery on a law enforcement officer, which properly served as a basis for the prior violent felony conviction aggravator regardless of whether the judgment incorrectly led the jury to believe the aggravated battery resulted in great bodily harm.

We agree with the postconviction court that Hernandez has failed to demonstrate prejudice. Even if trial counsel should have become more familiar with the trial proceedings in which Hernandez was convicted of aggravated battery on Deputy Jarvis, and should have clarified the discrepancy between the verdict and the judgment, prejudice has not been shown. The jury heard the direct testimony of Deputy Jarvis that after he was struck, he was able to subdue Hernandez and that his injury was a laceration and a big knot. Moreover, the conviction for aggravated battery supports the prior violent felony aggravator. There is no reasonable probability that, even if the matter had been clarified for the jury, a lesser sentence would have been recommended or imposed—a reasonable probability being measured in terms of whether our confidence in the outcome is undermined. For these reasons, relief on this claim was properly denied.

## 3. The Marital Privilege.

The State presented the testimony of Hernandez's wife, Stephanie, at the penalty phase of trial. Stephanie was asked if Hernandez told her what happened

to the victim when she, Hernandez, Tammy Hartman, and Richard Hartman were at the home of Hernandez and Stephanie discussing the incident. Penalty phase counsel Rollo objected and asked for a proffer to determine if marital privilege applied. When asked on proffer if she had had a private conversation with Hernandez about what happened, Stephanie replied, "It was always in front of somebody else. . . . in front of Tammy and Richard Hartman." Stephanie testified that Hernandez told her and the Hartmans at the same time that he cut the victim's throat "because he was afraid she wasn't dead yet." Penalty phase counsel did not object to her testimony after this proffer. When she testified before the penalty phase jury, Stephanie said that Hernandez told her "and the Hartmans" that he cut the victim's throat "[t]o make sure she was dead." Hernandez contends that counsel was ineffective in failing to object to her penalty phase testimony on the ground of marital privilege. Section 90.504(1), Florida Statutes (2007), provides that "[a] spouse has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, communications <u>which were intended to be made in confidence between spouses</u> while they were husband and wife." § 90.504(1), Fla. Stat. (Emphasis added).

In the postconviction evidentiary hearing, Stephanie confirmed that the statement that Hernandez cut the victim's throat because he was afraid she was not dead yet was made by Hernandez in front of her, but was directed to Tammy in

response to her questions, and that it was not a private conversation between Stephanie and her husband. The postconviction court denied the claim that penalty phase counsel was deficient in failing to object to Stephanie's testimony on the basis of the marital privilege, citing the fact that the statement was made in the presence of third parties and was directed to Tammy Hartman, not Stephanie. We conclude the circuit court was correct.

Stephanie testified both at trial and at the postconviction evidentiary hearing that Hernandez told her and the Hartmans that he cut the victim's throat to make sure she was dead. Hernandez contends that even if the statement was overheard or recorded, it is still privileged if the spouse is the only person who can testify to it—and he contends that neither Tammy nor Richard Hartman testified that Hernandez made that statement. Richard Hartman testified at the evidentiary hearing that when they were at the Hernandez's home and Tammy was confronting Hernandez about what had occurred with the victim, Hartman did "not think [Hernandez] said any details." Tammy had testified at trial that when she confronted Hernandez at his home that morning, he did not tell her what happened at the victim's home. However, Stephanie's sister, Tiffany, testified in the guilt phase that she was present at the Hernandez home the day after the murder and that the other persons present were Stephanie, Tammy and Richard Hartman, and Tiffany's husband. Tiffany testified that Hernandez told them all that he and

Arnold had gone to the victim's home for crack, that Arnold put a pillow over the victim's face, and that Hernandez said he stabbed the victim in the throat when she was "almost dead." Even if Tammy or Richard Hartman did not hear or recall Hernandez making the statement at his home that he cut the victim's throat, the marital privilege does not apply if the statement was knowingly made in their presence without any reasonable expectation of privacy or intent that the statement be made only to the spouse. Tiffany was also present and remembered hearing Hernandez discuss, in front of Stephanie and others, cutting the victim's throat.

Hernandez cites Boyd v. State, 17 So. 3d 812 (Fla. 4th DCA 2009), for the premise that the recording of a conversation does not compromise the privilege if the only person who can testify regarding its contents is a spouse. In Boyd, however, the husband and wife were conversing, ostensibly privately, in a police interrogation room. Id. at 814-15. Moreover, we noted in Boyd that section 90.507, Florida Statutes, provides that a privilege will be waived if a holder of the privilege makes the communication in circumstances in which he has no reasonable expectation of privacy. Id. at 817. Hernandez also cites Taylor v. State, 855 So. 2d 1, 26 (Fla. 2003), to contend that the privilege still applies if there are third parties nearby. In Taylor, the statements were made in the jail, but we noted that "there was no third party involved, no one overheard the conversation." Id. at 27 n.30. We also stated that, "[a]s a general rule, when third party

eavesdroppers hear otherwise privileged communications, the communications are not privileged unless the communicating parties had reasonable expectation of privacy." Id. at 27 n.30.

We have held that a communication between spouses is not privileged where the parties were aware of the presence of a third party and were "speaking in a manner and place where they had a reasonable chance of being overhead, and they knew the possibility at that time." Proffitt v. State, 315 So. 2d 461, 465 (Fla. 1975). We noted in Proffitt that there was "no testimony indicating that either the appellant or his wife made any attempt, no matter how little, to keep the conversation from being overheard." Id. Similarly, in this case, there was no indication that Hernandez or his wife attempted to keep the conversation private. Stephanie made clear in her testimony that Hernandez was telling her as well as Tammy and Richard Hartman what happened at the victim's home. Whether Tammy or Richard Hartman recalled Hernandez making the statements does not change the fact that Hernandez made the statements in the obvious presence of third parties and exhibited no intent that the communication be in confidence, as required by statute; thus, he had no reasonable expectation of privacy in making the statements.

Moreover, even if counsel had objected, there is no reasonable probability that the outcome of the penalty phase would have been different—that being a

probability sufficient to undermine this Court's confidence. A wealth of other testimony was admitted that Hernandez stated that he stabbed the victim in the throat, and why. Tammy Hartman testified that Hernandez told her later, from the jail, that he cut the victim's throat because she would not die and because she had seen their faces. Tiffany Telin also heard, and testified to, Hernandez's statement about cutting the victim's throat. Thus, even if Stephanie's testimony in the penalty phase had been excluded, the jury had ample testimony on which to find that Hernandez stabbed the victim in the throat to make sure she was dead and because she had seen their faces. Because neither deficiency nor prejudice has been established, relief was properly denied on this claim.

**Trial Counsel's Performance Regarding Background and Family Mitigation**

In his next claim, Hernandez contends that trial counsel was ineffective in the investigation and presentation of background and family mitigation evidence in the penalty phase. He argues that counsel should have located and presented numerous friends, family members, and other significant persons from Hernandez's childhood to present a complete picture of the defendant's life. He criticizes the fact that penalty phase counsel let Hernandez complete a "Confidential Assessment" form by himself. On the form, Hernandez did list

persons who had a significant role in the family, including Floyd Wayne Merritt, Deana Merritt, Joe Rudis, Tiffany Merritt (Telin), Amber Merritt, and his mother.

The postconviction court denied this claim, finding that trial counsel was not deficient in investigation and presentation of mitigation in the penalty phase. The circuit court found that penalty phase counsel presented two mental health experts who discussed Hernandez's exceptionally dysfunctional childhood and exposure to drugs and alcohol at an early age. The circuit court noted that penalty phase counsel also presented the testimony of Hernandez's mother Cheryl Walker and his half-brother Richard Travis Hartman. Further, a social services report from the Calaveras Works and Human Services Agency of California, which detailed the abuse Hernandez received when he was informally "fostered" by Dan and Leola Estabrook, was admitted into evidence and discussed by the defense experts.

Penalty phase counsel Rollo testified at the evidentiary hearing that he was able to furnish the experts with all the information they needed to establish the mitigators in the best and most credible way, in accord with his strategy to have the background information come in primarily through the experts who could rely on reports, hearsay, and testing. The court found that in preparation for the penalty phase, Rollo spoke with Hernandez as well as other potential witnesses, and rejected the idea of calling some because their testimony would have been cumulative. The circuit court stated in its order, "Given the amount of evidence

Rollo was able to present in this manner, it was not necessary for him to identify and interview every other family member, friend, or other person involved in Defendant's life." The court also noted that numerous mitigating factors were supported by the evidence Rollo did present in the penalty phase. Based on that mitigation, the trial court found twenty-four nonstatutory factors that were to varying degrees mitigating. The postconviction court also found prejudice was not established because the additional lay testimony presented at the postconviction evidentiary hearing "provided nothing dramatically different than what was established at trial." Further, the court concluded that "[t]o the extent the additional background information presents anything new, it would not have altered the sentencing profile presented to the judge and jury." We agree with all these assessments and find relief is not warranted on this claim.

At the penalty phase of trial, counsel presented the testimony of Dr. John Bingham, a mental health counselor who met with Hernandez on three different occasions and was provided with the Calaveras County report and Arnold's statement. Dr. Bingham also interviewed Hernandez's wife and read the deposition of Hernandez's mother. Dr. Bingham testified about Hernandez's physical and emotional abuse as a child, his childhood introduction to drug use, his dysfunctional family life, his chronic substance dependency, and his cocaine intoxication on the day of the murder. Hernandez was exposed to drugs at a very

early age and was taught how to use crack cocaine by his father.  He was required to roll marijuana cigarettes for him at the age of five, and started smoking marijuana and using other illegal substances on a daily basis.  His father introduced him to crack at age ten.  Dr. Bingham testified that Hernandez first used alcohol at age nine, and continued to use it until he got married.  Dr. Bingham explained that Hernandez also used hallucinogens, crystal methamphetamine, heroin, and tranquilizing pills as a teenager, and that he met the diagnostic criteria for a chemical dependency to marijuana and cocaine.  Dr. Bingham described for the jury the effects on the brain when crack cocaine is smoked and when an individual becomes dependent upon it—chronic crack cocaine use blocks the ability to have empathy or compassion, and causes aggressive behavior.

Dr. Bingham also testified about the records provided by the Calaveras Works and Human Services Agency of California, which detailed the abuse Hernandez received while living with the Estabrook family.  Dr. Bingham related reports of physical and psychological abuse, including Hernandez being slapped, spanked, dragged by the hair, and punched in the face, chest, and stomach, all on an inconsistent basis without any understanding of what he had done wrong.  This abuse lasted about three years, until the social services agency removed Hernandez from the Estabrook home.

Based on information learned from the Calaveras County report, Dr. Bingham testified that Hernandez received no psychological care and that "[b]ecause of the abuse he was placed in protective custody in May of 1996." Dr. Bingham told the jury that he believed Hernandez "definitely was affected by the different types of abuse that he has experienced it [sic] in his lifetime, as well as other things that have occurred in his lifetime." The jury heard that Hernandez was essentially abandoned by his parents and subjected to violence by his mother's boyfriends when he was with her. Dr. Bingham also related that Hernandez's step-grandmother, Barbara, confirmed that Hernandez's parents were members of a motorcycle gang and continuously used drugs. When his father died, Hernandez went to live with his mother but was unable to stay because of her dangerous lifestyle, resulting in his going to live with the Estabrooks. Dr. Bingham also testified that Hernandez had a good relationship with his wife, Stephanie, and was a good, loving father to his two daughters.

As to statutory mental health mitigation, Dr. Bingham testified at trial that Hernandez's actions on November 18, 2004, appeared to reflect "an absence of thinking and more reaction to the situation as it unfolded. . . . All they were interested in is responding in the sense of getting crack cocaine." Dr. Bingham testified that Hernandez's ability to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired as a

result of his chronic cocaine use and being under the influence at the time, as well as because of the psychological and physical abuse he had experienced.

As the postconviction court noted, a second defense mental health expert was presented in the penalty phase. Dr. Brett Turner, a neuropsychologist, became involved after Dr. Bingham identified a history of possible brain injuries and sought further testing to confirm brain damage. Dr. Turner explained that because of Hernandez's lack of participation and lack of motivation during his testing, several of the tests were invalid, including the neurological testing. Although he was not able to substantiate damage to Hernandez's frontal lobe because of the invalid neurological test score, Dr. Turner testified that Hernandez's history suggested it. Dr. Turner also explained that Hernandez's IQ score was accurate and was a full scale IQ score of 89, which is in the low-average range, and that Hernandez's achievement testing identified a learning disability. The penalty phase jury heard from Dr. Turner that Hernandez was also diagnosed with polysubstance dependence disorder, meaning that he had a potential addiction to most drugs because of his lengthy drug history that started at an early age, as well as depressive disorder, post-traumatic stress disorder, impulse control disorder or cognitive disorder not otherwise specified, and antisocial personality disorder.

Dr. Turner opined that Hernandez was "under extreme emotional disturbance at the time of the offense as a result of a chronic history of emotional

instability deficits and behavior control and deficits in his reasoning and cognitive abilities all acutely exacerbated by the effects of cocaine intoxication." He explained, "[Hernandez's] anxious and even manic state was also likely even more acute in the midst of even possibly recognizing that they were out of cocaine at the time, which again, would even inflame and exacerbate the anxiety and the feelings that were probably there . . . ." Dr. Turner also opined that Hernandez's capacity to appreciate the criminality of his conduct was substantially impaired "because appreciate actually means to be fully aware, and I do not believe that he was fully aware at the time of the incident offense. I believe he was engaged in a string of behavioral responses, one leading to the next . . . ."

In addition to the two mental health defense experts, defense counsel also presented mitigation testimony at trial from Hernandez's half-brother, Richard Hartman, Jr., and Hernandez's mother Cheryl Walker. We discussed their testimony in the direct appeal opinion as follows:

> The defense then presented testimony from Hernandez's half-brother, Richard Hartman Jr., and Hernandez's mother, Cheryl Walker,[FN5] about Hernandez's dysfunctional childhood in which he was exposed to drugs and violence from a young age. According to their testimony, Cheryl and Hernandez's father, Michael Hernandez Sr., used marijuana on a regular basis in Hernandez's presence when he was a child and also used crystal methamphetamine and cocaine. They wandered around the country and were in hiding from the Bandidos, a motorcycle group from which they had fell out of favor. Cheryl later left Michael Sr. and relocated to California with Hernandez. In California, Cheryl, who was no longer using methamphetamines but was drinking heavily, briefly reunited with

- 42 -

Michael Sr.  They later separated, and Cheryl left Hernandez, who was approximately three years old at the time, with his father while she sold drugs.  Michael Sr. lived with the Esterbrooks (sic), who were also using and dealing drugs.

> FN5. Cheryl testified through a videotaped deposition because she was serving a sentence in a correctional facility for killing her husband, Anthony Walker.

Richard Jr. and Cheryl testified that Hernandez returned to live with Cheryl several years later after she met and married Michael Murphy.  Murphy, who also abused drugs, beat Cheryl in front of her children and was jailed for putting a gun in her mouth.  Cheryl sent Hernandez back to his father because she was afraid for his life when she was with Murphy.  Hernandez lived with his father in a hotel room until his father's death from a drug overdose.

Richard Jr. and Cheryl also testified that Hernandez lived with Cheryl and her new husband, Anthony Walker.  Anthony was verbally and physically abusive, and Hernandez witnessed him choke, beat, and shake Cheryl.  Anthony also once punched Hernandez so hard that he needed an appendectomy.  Furthermore, both Cheryl and Anthony used alcohol and marijuana.

According to the testimony of Hernandez's relatives, Cheryl later sent Hernandez to live with the Esterbrooks (sic) once more, and Hernandez never lived with her again.  Hernandez reported being beaten and molested at the Esterbrooks' (sic) home, and he eventually left their home and was in the custody of the state.

In addition, Richard Jr. and Cheryl testified that Hernandez's paternal grandparents, Al and Barbara Hernandez, later took him to live with them, and he never saw his mother again until he testified for her at her trial for killing Anthony.  Hernandez then stayed with Richard Jr. as well as with his other half-brother, Shawn Hartman.  Hernandez also lived on the streets.  After Richard Jr. found this out, he talked Hernandez into living with him again in Florida, where Hernandez alternated living with Richard Jr. and Richard Sr.  Hernandez used cocaine during this time and smoked marijuana.  Hernandez later moved to Tennessee with his wife.

Hernandez, 4 So. 3d 652-53.

At trial, the defense also offered into evidence as mitigation Shawn Arnold's judgment and sentence for the crimes he committed in this incident. This evidence showed that Arnold pleaded nolo contendere to felony murder with a deadly weapon and was sentenced to a term of natural life without the possibility of parole. The postconviction court denied the claim, concluding that there is no showing that counsel was deficient in supplying the experts with sufficient information as to Hernandez's background or in preparing them to testify. In addition, the court found that even if all the mitigation had been corroborated by other witnesses and records, it would not have resulted in a life sentence.

The additional family and background mitigation that Hernandez now contends should have been presented at trial was presented to the circuit court at the postconviction evidentiary hearing. These witnesses included a number of family and childhood friends that postconviction counsel contends should have been presented, or at least consulted by trial counsel, regarding mitigation. Joe Rudis, Stephanie's stepfather, testified at the postconviction evidentiary hearing that he introduced Hernandez to Stephanie, whom Hernandez later married. Rudis testified that Hernandez was a hard worker and a "normal guy," and was good to Stephanie and the children. Rudis was formerly married to Stephanie Hernandez's mother, Deana Merritt, who testified at the evidentiary hearing that she was impressed with Hernandez, who was a hard worker around the church and was a

loving father. She described Hernandez as a humble person who was a follower, not a leader, and that the murder was completely out of character for him. Floyd Wayne Merritt, Stephanie's father, testified at the evidentiary hearing that Hernandez "seemed like a pretty good fellow" who would "give the shirt off his back," and was a hard worker. Merritt said Hernandez had low self-esteem, was a follower, and that the murder was completely out of character.

Hernandez's half-brother, Shawn Hartman, who is nine years older than Hernandez, testified at the evidentiary hearing that their mother drank alcohol daily while she was pregnant with Hernandez. He described how, when Hernandez was a young teen, he was drinking alcohol and "participating in the marijuana that would go around the room." Later, when Hartman was about fifteen, he lived with their mother Cheryl, Michael Murphy, and Hernandez. Their brother Richard Travis Hartman also came to live with them after about six months. The boys were allowed to drink alcohol and smoke marijuana at home. When Murphy went to jail, their mother would go away for weeks at a time to see him and Shawn Hartman was responsible for taking care of all the boys. Hartman also confirmed that Hernandez stole drugs from him and took some of his tools. He testified that Hernandez was a follower and was never violent. Jennifer Hartman, who was married to Shawn Hartman testified that he was "cooking" and selling methamphetamine when Hernandez lived with them. She said Hernandez began to

show signs of drug use and that Hernandez was a follower, not a leader, and was not violent.

Postconviction counsel also presented the testimony of Brandy Kahl-Hayman, who lived in same apartment complex in California as Shawn Hartman. She testified that Hernandez, who was about age sixteen at the time, was not violent or mean, but was helpful and always had a smile on his face. At one point, she noticed he was losing weight and she thought he was doing methamphetamines, which she knew Shawn Hartman was involved in producing. Kahl-Hayman testified that one time when Hernandez was staying with her and her ex-husband, Hernandez tried to protect her when her husband attacked her. Later, after Hernandez moved to Tennessee, she was able to see him again. She said he looked like he was no longer using methamphetamines, but when she later socialized with Hernandez and his wife, she noticed signs that he appeared to be using drugs again, suggesting to her a pattern of using, stopping, and recommencing drug use. She said Hernandez was a great father to his children and loved them.

Brandi Lori Higashi testified by deposition that her parents were friends with Michael Hernandez, Sr., and she spent much of her time baby-sitting Hernandez while their parents got high. She testified that Hernandez had blackouts that his father attributed to a "really bad" bicycle accident. She said that for Hernandez's

ninth or tenth birthday, his father gave him cocaine, and that until his father died, she believed Hernandez got high on crack cocaine every day.

Sean Skehan, who originally went under the name Sean Estabrook, was presented at the evidentiary hearing. He testified that Hernandez came with his father to live with the Estabrook family for a period of time, and later lived there again after his father died. At that time, Hernandez was about eleven years old. Skehan testified that Hernandez's father had never mistreated or abused him and that Hernandez took his father's death very hard. When Hernandez was younger, he told Skehan about the times he lived with his mother and how she left him alone with men and drugs, and that he was sexually abused by the men. Once, Skehan was told, Hernandez was visiting his mother and one of her boyfriends or husbands punched Hernandez in the stomach and ruptured his appendix. Another time Hernandez returned from a visit with his mother and had two broken front teeth.

Skehan testified that Hernandez was being abused in the Estabrook household and was treated "like a slave" and "like dirt." His mother called Hernandez terrible names and told him he was dumb and worthless. Skehan said the Estabrooks received money from Social Security to care for Hernandez, but it was not spent on him. Leola Estabrook made Hernandez wear her son's hand-me-down clothes and made him eat after everyone else, and he was not given school lunch money like the other boys. Skehan said his stepfather, Dan Estabrook,

would whip Hernandez, and probably resented Hernandez because Estabrook, Hernandez's father, and Dan Estabrook's wife, Leola, had been in a "love triangle." Dan Estabrook would slap, punch, kick, and pick Hernandez up by the hair almost daily. Skehan testified that Hernandez was bullied in school but would never fight back. He cried a lot and tried to run away, and when he returned he was beaten. Skehan ultimately reported the abuse to the social welfare authorities of Calaveras County and both he and Hernandez were placed in foster care. He described Hernandez as a follower lacking self-esteem and a feeling of self-worth.

Skehan's brother, Eric Estabrook, also testified at the evidentiary hearing. He is about four or five years older than Hernandez. Eric testified that his mother and stepfather treated Hernandez very badly and would call him terrible names, and that Leola made Hernandez rub her feet for lengthy periods of time. Eric said he treated Hernandez badly too, which he regrets, and that Hernandez was bullied at school and teased about his father. Eric said that in spite of all the abuse, Hernandez "stayed the person that he was. A heart of gold. And he would do anything for anybody."

Leola Estabrook testified at the postconviction evidentiary hearing that Hernandez first came to live with them as a toddler with his father and then later after his father died. She testified that Hernandez's father was loving and a great father, but he went back to using drugs after receiving a settlement in some matter.

He died shortly thereafter when a companion gave him an overdose of drugs. She said Hernandez stayed with the Estabrooks until he was in high school. She admitted that she was "not exactly perfect" in her treatment of Hernandez, in that she yelled at him and "smacked him" a lot. When asked if she treated Hernandez like a slave, she answered, "Yes and no." She said all the boys had chores but she was harder on Hernandez. However, she denied he had to eat last and explained that Hernandez got smaller portions because he was overweight. She agreed she had him rub her feet sometimes because she was on her feet all day at work. She denied treating Hernandez "like dirt," and said the social workers took Hernandez away only because she "had no legal guardianship over him." She did agree that her husband abused Hernandez, and threatened him not to report the abuse.

Hernandez's step-grandmother Barbara Walker [formerly Barbara Hernandez] testified at the evidentiary hearing that she would have testified in the penalty phase of trial if she had been asked. She did speak with penalty phase counsel Rollo prior to trial and she spoke with Dr. Bingham. She described her stepson, Michael Hernandez, Sr.'s, struggle with drug use after returning from service in Vietnam. She also testified that defendant Hernandez lived with her and her husband for a time after he left the Estabrooks, but he would not attend class and began associating with people on "the street." She described how he went to live with an uncle but got drunk and crashed a truck that belonged to his uncle's

employer. Rollo testified that prior to trial, Barbara Walker told him she did not want to testify at trial. Even so, Rollo presented her testimony to the judge in the Spencer hearing.

Finally, postconviction counsel presented the testimony of Richard Travis Hartman, Hernandez's half-brother, who did testify in the penalty phase of trial. He related an incident in which their mother made them hide because someone was trying to kill them. Richard Travis testified that one of his mother's boyfriends, Anthony Walker, treated Hernandez badly, and that that later in life, when Hernandez worked for Richard Hartman, Sr., on handyman jobs, Hernandez was doing most of the work but getting very little of the money. Richard Travis described Tammy Hartman as a liar who lied to his father about him, and said that Tammy favored her daughter Michelle over everyone else.

The testimony of these family members and friends did paint Hernandez in a sympathetic light and added some specific incidents illustrating the childhood abuse Hernandez suffered, which the defense experts and two family members testified about in the penalty phase. However, this evidence was essentially a reiteration of what the penalty phase jury heard through the mitigation witnesses. The postconviction court was correct in concluding that trial counsel was not deficient in failing to present these additional witnesses at trial. Further, presentation of these witnesses would have provided the prosecutor with an

opportunity to cross-examine them regarding the information about abuse set forth in the Calaveras County report and would have allowed Leola Estabrook to deny many of the allegations that Sean (Estabrook) Skehan made, which were discussed in the report.

As the circuit court found, penalty phase counsel made a strategic decision to present the very strong mitigation concerning Hernandez's abusive childhood and his early and continued drug use and dependency mainly through the experts and the Calaveras County report. Many of the important details were also brought in at trial through the testimony of his mother and brother, and much of the evidentiary hearing testimony was cumulative or simply expanded on the details. We have held that "[c]ounsel cannot be found ineffective for failing to provide cumulative evidence." Kilgore v. State, 55 So. 3d 487, 504 (Fla. 2010) (quoting Gudinas v. State, 816 So. 2d 1095, 1108 (Fla. 2002)). We explained in Kilgore that "although the evidence presented during the postconviction hearing enhanced much of the evidence presented during the 1994 penalty phase, it did not really add anything new. The evidence presented during the 2005 evidentiary hearing painted Kilgore's childhood more clearly, but the basic elements that were relevant to mitigation were revealed and presented during the 1994 penalty phase proceedings." Kilgore, 55 So. 3d at 504. See also Valle v. State, 705 So. 2d 1331, 1334 (Fla. 1997) (finding claim without merit that counsel was ineffective for

failing to call mother and former wife to buttress the expert testimony regarding Valle's difficult childhood and failure to discover corroborative evidence, all of which would have been cumulative). These same characterizations and conclusions apply to the instant case.

Even if all this additional detail had been presented, there is no reasonable probability that Hernandez would have received a life sentence, that probability being expressed in terms of whether the Court's confidence in the outcome of the penalty phase is undermined. Even if the mitigation evidence had been presented in greater detail, the jury and judge would have heard essentially the same type of mitigation, which was outweighed by the heavy, serious aggravators in the case. For these reasons, trial counsel was not ineffective in the presentation of family and background mitigation at trial.

### Trial Counsel's Performance Regarding Proof of Brain Damage

Hernandez next contends that trial counsel was ineffective in failing to obtain quantitative electroencephalography (qEEG) testing to determine if he had brain damage for the purpose of mitigation. When the qEEG testimony was offered at the evidentiary hearing, the State filed a "Motion to Prohibit the Use of Quantitative (qEEG) Testing," and the trial court conducted a Frye[10] hearing

----

10. Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

during the evidentiary hearing to determine if the opinions based on qEEG testing would have been admissible in the 2007 trial of this case if trial counsel had obtained the testing and offered the opinions in mitigation. The postconviction court denied this claim, finding that the technology and opinions stemming from it would not have met the Frye test for admissibility at trial.

The postconviction court cited the testimony of the State's expert, Dr. Peter Kaplan, a medical doctor and neurologist who is board certified in psychiatry, neurology, and neurophysiology, and is a professor of neurology at Johns Hopkins University School of Medicine. He is an expert in the use of electroencephalogram (EEG) technology, and he explained that qEEG is a computer program that uses data provided by and chosen from the EEG test and compares that chosen EEG data to a database made up of an aggregate of subjects. Dr. Kaplan testified during the Frye portion of the evidentiary hearing that neurologists use EEG to help diagnose neurological conditions, although qEEG has been used in different settings to diagnose epilepsy. Dr. Kaplan testified that qEEG is not widely accepted by neurologists, who are the professionals who diagnose neurologic disease or brain damage. He testified that when qEEG is performed, it is often not done by a doctor or neurologist, and that "one doesn't reach a diagnosis by

comparing to a clinical data base."[11] Dr. Kaplan testified these flaws in qEEG were present in 2007 as well as currently.

On cross-examination, Dr. Kaplan agreed that the Veterans Administration has been using qEEG in relation to traumatic brain injury and some universities use the proprietary qEEG program, NeuroGuide, for some purpose. He explained, "You can use the [qEEG] technique to examine data. It's then how you apply the data to make a diagnosis" and "if you have other ways of interpreting those data to reach a clinical diagnosis, it could be, of course, completely valid." Dr. Kaplan also testified that if an individual did not cooperate or follow instructions during the EEG that is done to obtain the raw data, which is then fed into the qEEG software for quantification, the results could contain invalid data, although such lack of cooperation would be fairly obvious.

In denying relief on this claim, the postconviction court also cited testimony of Hernandez's witnesses. Dr. Gerald Gluck, a psychotherapist who testified that he has been using qEEG since the 1980's primarily for "neuro feedback" or

---

11. Dr. Kaplan also discussed an article by Marc Nuwer, M.D., Ph.D., Assessment of Digital EEG; Quantitative EEG and EEG Brain Mapping: Report of the American Academy of Neurology and the American Clinical Neurophysiological Society, 49 NEUROLOGY 277 (1997). Dr. Kaplan agreed with the statement in the report that qEEG should not be used in judicial settings because of the propensity of false positives and because results can be dramatically altered during the subjective process of selecting portions of the EEG for quantitative analysis.

"biofeedback," agreed that many neurologists do not use qEEG. He began using "NeuroGuide" software with its "normative data base" in 2001, and said qEEG was more common in the psychological community in 2001. Dr. Gluck performed a qEEG examination on Hernandez and concluded that Hernandez has "frontal, temporal, central deregulation, which is associated with brain injury and damage."

The postconviction court also cited the testimony of Hernandez's witness, Dr. J. Lucas Koberda, a neurologist who testified that he began using qEEG around 2010. The court cited Dr. Koberda's testimony that most neurologists do not use qEEG and that he did not use it in 2007. Dr. Koberda testified that he examined the EEG data collected by Dr. Gluck and the qEEG report he generated, and noted that the "regular EEG . . . showed abnormalities in the frontal and temporal lobes indicating potential brain damage there." In denying relief on this claim, the postconviction court also cited Dr. Koberda's testimony that there was not really any controversy in using qEEG to help diagnose memory problems, Alzheimer's disease, dementia, or epilepsy, but that there is controversy over use of it to diagnose brain damage.

Dr. Turner, one of Hernandez's trial experts, testified at the evidentiary hearing that he had difficulty in assessing whether Hernandez had brain damage at the time of trial primarily because Hernandez was uncooperative. He did not recommend qEEG testing to trial counsel, and he noted that, at that time, there was

a dispute about the validity of qEEG testing. Penalty phase counsel Rollo testified at the evidentiary hearing that if he had presented qEEG testimony, and if it had been challenged as not being valid or efficacious, he would have been "injecting another level of uncertain nebulous evidence" in a case in which he was trying to maintain a coherent theme.

"Under Frye, '[t]he proponent of the evidence bears the burden of establishing by a preponderance of evidence the general acceptance of the underlying scientific principles and methodology.' " Marsh v. Valyou, 977 So. 2d 543, 547 (Fla. 2007) (quoting Castillo v. E.I. du Pont de Nemours & Co., Inc., 854 So. 2d 1264, 1268 (Fla. 2003)). The postconviction court held that Hernandez failed to establish that the qEEG analysis would have passed the Frye test at the time of trial by failing to demonstrate that qEEG was widely accepted by the relevant scientific community in 2007. Thus, the court held that trial counsel was not deficient in failing to pursue qEEG testing to show Hernandez suffered from brain damage.

Hernandez argues here that the proper test to apply for the admissibility of qEEG is Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), based on the Legislature's 2013 amendment to section 90.702, Florida Statutes. He also contends that the admissibility of qEEG should be measured by the date of the original appeal in 2009, not trial in 2007. The State counters that under either Frye

or <u>Daubert</u>, qEEG was not admissible at the 2007 trial, which is the date on which this issue should be examined, citing <u>Mendoza v. State</u>, 87 So. 3d 644 (Fla. 2011). We held in <u>Mendoza</u> that because the claim was one of ineffective assistance of trial counsel, the postconviction court did not abuse its discretion in excluding evidence of qEEG results because that technology had not passed the <u>Frye</u> test at the time Mendoza was tried in 1992. <u>Id.</u> at 666. Thus, the relevant time frame for determining if qEEG met the test for admissibility was the time of trial because the issue is raised here in a claim of ineffective assistance of trial counsel.

Section 90.702 was amended in 2013 to provide that testimony by an expert who is qualified by knowledge, skill, experience, training, or education may testify in the form of opinion if (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. <u>See</u> § 90.702(1)-(3), Fla. Stat. (2013). The intent of the amendment, it has been said, is to tighten the rules for admissibility of any expert opinion. <u>See</u> <u>Perez v. Bell South Telecommunications, Inc.</u>, 138 So. 3d 492, 497 (Fla. 3d DCA 2014). However, the Supreme Court in <u>Daubert</u> actually criticized <u>Frye</u> and its "exclusive test" imposing a "rigid 'general acceptance' requirement" as being at odds with the liberal thrust of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony." <u>Daubert</u>, 509 U.S. at 588-89 (quoting

Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1988)). Moreover, general acceptance in the relevant scientific community remains one factor among several even when the Daubert test is the applicable test. See Marsh, 977 So. 2d at 546.

Hernandez contends that the relevant scientific community is not limited to neurologists, as Dr. Kaplan testified and the trial court found. The postconviction court disagreed with this same contention, applied the Frye test to the expert testimony presented at the evidentiary hearing, and concluded that Hernandez failed to prove by a preponderance of evidence that qEEG was generally accepted in the relevant scientific community—that community being neurologists—at the time of trial. We agree. Dr. Kaplan testified that qEEG is not a reliable method for determining brain damage and is not widely accepted by those who diagnose neurologic disease or brain damage. His testimony provided competent, substantial evidence on which the court could conclude that the relevant scientific community was neurologists who generally diagnose brain damage and whose training and experience include conducting an EEG and reading and understanding the raw EEG data. Dr. Koberda also testified that most neurologists do not use qEEG and that he did not use it in 2007. Dr. Gluck testified that he has been using qEEG since the 1980's, primarily for "neuro feedback," but agreed that many neurologists do not use qEEG.

Furthermore, a number of judicial decisions in existence at the time of trial also held that qEEG testing was not admissible. For example, in In re Breast Implant Litigation, 11 F. Supp. 2d 1217 (D. Colo. 1998), the court found that qEEG did not meet the Daubert standard because the evidence showed the scientific community was not in agreement on its value. Id. at 1238. In Craig v. Orkin Exterminating Co., Inc., 2000 WL 35593214 at *3 (S.D. Fla. 2000), the court noted a number of court decisions that have found qEEG inadmissible. See also Falsen v. Secretary of Dept. of Health and Human Services, 2004 WL 785056 *11 (FED. CL. 2004) (qEEG found not "generally accepted within the medical sphere of neurology").

Because the postconviction court had competent, substantial evidence on which to find that the relevant scientific community was neurologists whose job it is to diagnose brain damage, and because all the testifying experts agreed that qEEG was not generally accepted by that scientific community as a method of diagnosing brain damage, the court was correct in finding Hernandez's trial counsel was not deficient in failing to obtain qEEG testing on Hernandez as a way of demonstrating brain damage in 2007. Moreover, Rollo's penalty phase experts did not recommend qEEG testing at the time. Even if trial counsel had presented this qEEG evidence, and even if it had been found admissible, the most that could be said from the qEEG test done on Hernandez was that the findings were

"associated" with brain damage or indicated "potential" brain damage. At trial, Dr. Turner testified similarly based on his evaluation and testing of Hernandez that he found the "likelihood of some sort of brain damage." Adding potential brain damage as indicated by qEEG testing to that testimony would not have altered the balance of aggravators and mitigators to such an extent as to undermine this Court's confidence in the result of the penalty phase trial.

Hernandez also contends that even if the qEEG test would not have been accepted in 2007 as not being fully established in the relevant scientific community, it should now be considered newly discovered evidence that requires a new trial. The postconviction court rejected this argument as well, holding that Hernandez did not prove wide acceptance of the technology in 2012. Moreover, the qEEG technology is not newly discovered evidence. It was in existence at the time, but would not have met the Frye test for admissibility. Moreover, as noted above, even if it were now admissible, it would probably not result in a life sentence. See Kormondy v. State, 154 So. 3d 341, 351 (Fla. 2015) ("If the defendant is seeking to vacate a sentence, the second prong [of the test] requires that the newly discovered evidence would probably yield a less severe sentence.").

The postconviction court found that even if the testing were admissible as newly discovered evidence, it would not result in a life sentence when considered in light of the heavily weighted aggravators. To obtain a new trial based on newly

- 60 -

discovered evidence, the evidence must have been unknown by the court, party, or counsel at the time of trial and the defendant or counsel could not have discovered it by due diligence; further, the newly discovered evidence must be of such nature that it would probably result in a less severe sentence.  Riechmann, 966 So. 2d at 316.  The evidence presented at the hearing did not establish that qEEG would be admissible even if a new trial is granted.  Further, the evidence of possible brain damage about which Hernandez's experts testified is not substantially stronger or more conclusive than that presented by defense experts in the penalty phase.  For all the foregoing reasons, the circuit court did not err in denying relief on this claim.

### Mental Health Mitigation

Hernandez next contends that penalty phase counsel was deficient in investigating and presenting mental health mitigation.  The circuit court heard evidentiary hearing testimony from Dr. Deborah Mash, Dr. J. Lucas Koberda, Dr. Gerald Gluck, Dr. Peter Kaplan, and Hernandez's trial experts, Drs. John Bingham and Brett Turner.  The circuit court denied the claim, concluding that penalty phase counsel Rollo supplied the two trial defense experts, Drs. Bingham and Turner, with extensive information about Hernandez's background and, after their examinations, they were able to diagnose him with a number of mental disorders.  The court also noted Dr. Turner's testimony at the penalty phase that he

was unable to complete some of the tests because of Hernandez's failure to cooperate. For this reason, he was unable to confirm brain damage, although he suspected it as he testified at trial. The circuit court noted that the two defense experts presented at trial testified that two statutory mental health mitigators were present, although the trial court rejected those mitigators. Based on the evidence presented at the penalty phase and in the postconviction hearing, the circuit court held that penalty phase counsel was not deficient, and that even if the additional mental health mitigation presented at the evidentiary hearing had been presented at trial, it would not have resulted in a life sentence. The court found that "[t]here is no showing the trial court would have changed its rejection of the mental health mitigators based on this additional evidence." The court also found that Hernandez failed to show that the additional information presented in the evidentiary hearing "would have enabled Turner to confirm his diagnosis of possible brain damage or otherwise changed the expert's diagnoses and opinions." We agree that trial counsel was not deficient in the preparation of the experts or in the presentation of mental health mitigation at trial.

Dr. Bingham, a mental health counselor who was one of Hernandez's trial experts, testified in the penalty phase of trial that based on the information he had reviewed and the evaluations and testing done on Hernandez, he "definitely was affected by the different types of abuse that he [had] experienced [in] his lifetime,

as well as other things that have occurred in his lifetime." At the evidentiary hearing, Dr. Bingham testified that Rollo provided him with medical records, a partial psychological evaluation by a Dr. Larson,[12] three offense reports, records provided by the Calaveras Works and Human Services Agency, some school records, a telephone conversation with Stephanie Hernandez, a deposition of defendant's mother Cheryl Walker, statements of the defendant's step-grandparents, and the taped statement given police by Hernandez. He also performed various tests and examinations on Hernandez prior to testifying in the penalty phase of trial.

Based on all the information he received, Dr. Bingham testified at trial that Hernandez was exposed to drugs at a very early age and had used marijuana, alcohol, and crack cocaine as a child, and used hallucinogens, crystal methamphetamine, heroin, and tranquilizing pills as a teenager. Dr. Bingham reported that Hernandez was taught how to use crack cocaine by his father, and was required to roll marijuana cigarettes for him at the age of five. The jury heard that Hernandez started smoking marijuana and using other illegal substances on a daily basis at an early age, and that his father even introduced him to crack cocaine

12. Dr. Larson was first retained by the defense, but when Hernandez went to his office to be evaluated, Hernandez attacked Deputy Jarvis with the toilet tank lid. Dr. Larson did not continue on as a defense expert.

at age ten.  Hernandez first used alcohol at age nine, and continued to use it until around age twenty-one, when he got married.  Dr. Bingham testified at trial that Hernandez was also subjected to physical, mental, emotional, and possibly sexual abuse, which could prevent a person from "fully developing and having the internal resources to make good decisions," and he opined that Hernandez self-medicated with drugs to take away the emotional pain.  Dr. Bingham also opined that Hernandez met the diagnostic criteria for a chemical dependency to marijuana and cocaine, and he described for the jury the effects on the brain when crack cocaine is smoked—chronic crack cocaine use blocks the ability to have empathy or compassion, and causes aggressive behavior.

Finally, in the penalty phase, Dr. Bingham testified that Hernandez's actions on the day of the murder appeared to reflect "an absence of thinking and more reaction to the situation as it unfolded. . . .  All they were interested in is responding in the sense of getting crack cocaine."  He believed that Hernandez's ability to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired as a result of his chronic cocaine use, being under the influence at the time, and because of the psychological and physical abuse he had experienced.  Dr. Bingham confirmed that prior to the penalty phase of trial, he did not recommend any brain imaging to trial counsel as a way to confirm brain damage that he suspected.

Dr. Brett Turner, the second mental health expert who testified at trial, testified in the evidentiary hearing that in preparation for his penalty phase testimony he reviewed Hernandez's background documents collected by Dr. Bingham. Dr. Turner also interviewed Hernandez, and performed various tests. Dr. Turner told the penalty phase jury that although he was not able to substantiate damage to Hernandez's frontal lobe because of the invalid neurological test score, he believed that Hernandez's history suggested it. Dr. Turner also diagnosed Hernandez as having polysubstance dependence disorder, meaning that Hernandez had a potential addiction to most drugs because of his lengthy drug history that started at an early age. He testified that he diagnosed Hernandez with depressive disorder and post-traumatic stress disorder. Dr. Turner further testified at trial that Hernandez had impulse control disorder or cognitive disorder not otherwise specified, and antisocial personality disorder.

Dr. Turner also opined in the penalty phase that Hernandez was "under extreme emotional disturbance at the time of the offense as a result of a chronic history of emotional instability deficits and behavior control and deficits in his reasoning and cognitive abilities all acutely exacerbated by the effects of cocaine intoxication." Dr. Turner explained, "His anxious and even manic state was also likely even more acute in the midst of even possibly recognizing that they were out of cocaine at the time, which again, would even inflame and exacerbate the anxiety

and the feelings that were probably there . . . ." He told the jury that Hernandez's capacity to appreciate the criminality of his conduct was substantially impaired "because appreciate actually means to be fully aware, and I do not believe that he was fully aware at the time of the incident offense. I believe he was engaged in a string of behavioral responses, one leading to the next . . . ." At the evidentiary hearing, Dr. Turner testified that he was asked by trial counsel to evaluate Hernandez for brain damage, but was unable to conclusively determine it. Dr. Turner did continue to suspect "some type of mild, traumatic brain injury," as he testified at trial.

Postconviction counsel presented several other mental health experts at the evidentiary hearing who he contends should have been presented at trial to substantiate the suspicion that Hernandez had brain damage and other mental health mitigation. Deborah C. Mash, Ph.D., professor of neurology and molecular cellular pharmacology at the University of Miami School of Medicine, testified as an expert in the area of substance abuse and the effect of abused drugs on the human brain. Based on a psychosocial assessment about Hernandez's historical drug use and a review of his neuro-developmental timeline of exposure to drugs and alcohol, Dr. Mash testified that, in her opinion, he suffers from post-traumatic stress disorder, poly-substance abuse disorder involving cocaine and alcoholism, genetic risk for substance abuse and neuropsychiatric disabilities, and neuro-

developmental disability beginning in utero due to the drug and alcohol abuse by his mother. Dr. Mash also testified that Hernandez's pyloric stenosis as a baby—a fact not brought out in the penalty phase of trial—was important because that condition is an indicator of third-trimester maternal drug abuse, poor nutrition, socioeconomic factors, and general health problems in the mother.

She testified that the level of stress and abuse Hernandez was subjected to was extreme, and there was never a time in his life when he was in a stable neuro-developmental state. She testified the physical and drug abuse he suffered would have affected his amygdala, which is the seat of the brain's limbic system—governing the fight or flight reaction. She opined that he is very impaired in his ability to deal with novel situations, and being involved in murder and being jailed are such novel situations that would have caused extreme stress and could account for the violence Hernandez displayed after his arrest. She explained that his withdrawal from the cocaine he had been ingesting the day before would have made him "more reactive" with "heightened anxiety." She said that once the normal testing to discover the extent of suspected brain damage was unsuccessful, as occurred in this case, the experts should have pursued a different course to determine the extent of damage. She testified that Hernandez's exposure to drugs and alcohol, and dysfunction in the circuit of his brain were what contributed to the

mitigator of lack of ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law.

At the postconviction evidentiary hearing, Dr. Koberda, a board certified neurologist, testified that he took raw EEG data from an EEG performed on Hernandez by Dr. Gluck, and put it through a "NeuroGuide" qEEG software program to analyze it. Dr. Koberda opined that the qEEG results showed deviation from the norm, and that the EEG alone indicated the "very high likelihood that there is brain damage" in the frontal and temporal regions of the brain. He did not examine Hernandez, but concluded from the history given and the qEEG testing that there is a high likelihood of brain damage or organic brain damage. Hernandez also presented the testimony of Dr. Gluck, who performed qEEG testing on Hernandez for the postconviction hearing. Dr. Gluck concluded, based on the qEEG testing, that Hernandez has "frontal, temporal, central deregulation, which is associated with brain injury and damage."

Thus, Hernandez contends that penalty phase counsel was deficient for failing to obtain further testing to confirm suspected brain damage, which he argues could have been done by a more thorough neurological evaluation and testing, or by use of qEEG testing as testified to at the evidentiary hearing. He contends that testimony similar to Dr. Mash's testimony would have been a critical component of proper mental health mitigation because she could have made clear

that his neurological deficits began in utero as a result of his mother's drug and alcohol abuse, and that he had an extreme genetic risk of substance abuse. Hernandez contends that Dr. Mash could more fully explain how his brain damage and drug abuse made him incapable of dealing in a coherent way with novel or stressful situations, and would have countered the trial testimony of State's penalty phase witness, Dr. Harry McClaren, who testified that Hernandez did not meet the statutory mitigator of extreme mental or emotional disturbance.

The circuit court denied relief and found that Hernandez failed to show the additional information presented in the evidentiary hearing would have enabled Dr. Turner to confirm his diagnosis of possible brain damage or otherwise changed the experts' diagnoses and opinions. We have held many times that "defense counsel is entitled to rely on the evaluations conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire." Stewart v. State, 37 So. 3d 243, 251-52 (Fla. 2010) (quoting Darling v. State, 966 So. 3d 266, 377 (Fla. 2007)); see also Rodgers v. State, 113 So. 3d 761, 770 (Fla. 2013) (same); Wyatt v. State, 71 So. 3d 86, 110 (Fla. 2011) (same). We noted in Wyatt that the defendant "did not prove that a reasonable trial attorney should have known to not rely on the conclusions offered by the mental health experts who evaluated him. Thus, he did not prove that his counsel was deficient." Id. (quoting Stewart, 37 So. 3d at 253). Moreover, we have held

repeatedly that the fact that postconviction counsel has "now secured the testimony of [a] more favorable mental health expert[] simply does not establish that the original evaluations were insufficient." Johnson, 135 So. 3d at 1030 (quoting Carroll v. State, 815 So. 2d 601, 618 (Fla. 2002)).

In the present case, Hernandez failed to prove that either of his trial counsel were deficient in providing records and information to the experts or in relying on their evaluations. Dr. Bingham suspected possible brain damage and counsel retained Dr. Turner to further investigate possible brain damage, but he was unable to make conclusive findings primarily because Hernandez was uncooperative. Both defense experts did testify in the penalty phase that they saw indications of possible brain damage. Even after the testing that Hernandez obtained for the postconviction hearing, the new experts were not any more conclusive on the question of whether Hernandez had brain damage than the trial experts. For these reasons and based on this Court's precedent, we conclude that the postconviction court did not err in finding trial counsel was not deficient in failing to obtain further testing to confirm brain damage or provide additional mental health mitigation. Further, even if counsel had obtained testimony similar to that presented at the evidentiary hearing regarding brain damage, such testimony, if found admissible and submitted to the jury or judge, does not demonstrate a

probability that Hernandez would have received a life sentence—that probability being one that undermines this Court's confidence in the result.

**Trial Counsel's Theory of Defense**

Hernandez claims that Stokes was deficient in his presentation of the guilt phase defense because it did not coordinate well with the penalty phase strategy. He argues that trial counsel should have conceded a lesser offense, such as second-degree murder, rather than arguing that Hernandez was not guilty of the crimes charged. Because the closing argument in the guilt phase sets forth Stokes' guilt phase strategy, those pertinent arguments are discussed next. In the guilt phase closing arguments, Stokes portrayed Hernandez as new to the area and with few friends. He had stopped using crack cocaine until he met Shawn Arnold. Stokes argued that Tammy Hartman envisioned her daughter married to Arnold and raising their child together, but Arnold was using drugs and buying drugs from David Everett. Stokes argued that Arnold knew David Everett while Hernandez did not, and that Arnold, not Hernandez, had met Ruth Everett in the past and was the one "running the show." Counsel argued that Arnold had the car and knew where to buy drugs, and that "Shawn Arnold was the classic bad guy in this story."

Stokes argued that it was Arnold who attempted to smother the victim with the pillow, bruising her face in the process. He argued that "the broken neck could have been caused by Shawn Arnold pushing that pillow against her neck so that it

was forced backward in the recliner," a concession Stokes obtained from the medical examiner. Stokes contended that Hernandez thought Arnold had killed her and asked Arnold to help move the body. When she was dropped, that could have broken her neck, he contended. He argued it was Arnold who stole the victim's purse; it was Arnold's knife that was used to stab the victim in the neck; and it was Arnold's dumpster where the purse and credit cards were found and then moved by Tammy Hartman.

Stokes argued that Tammy Hartman was the matriarch of the family and thought herself an amateur detective. Stokes contended, "Tammy ran the show. Everybody did what Tammy said." She got the knife from the car and put it in a towel, he contended, to wipe off the fingerprints. She threw the knife in a garbage bag with the purse, check book, and ATM cards found in the dumpster outside Arnold's house, put the bag in her truck, and drove to Hernandez's house. Stokes contended that when she found Hernandez, he was intoxicated on crack cocaine. Stokes argued, "Tammy Hartman was able to manipulate Michael Hernandez just as she had been manipulating everyone else because, see, Michael Hernandez in this state, couldn't remember what happened the day before. . . . she filled in the blanks" in such a way as to protect Arnold. Stokes argued that Tammy "planted in his mind the idea that he was the one that cut the lady's throat." Stokes also emphasized Tammy's confusion in recounting who told her details of the crime.

Stokes' theory, which he reemphasized for the jury, was that Hernandez was just along for the ride, did not know the victim, and had no reason to want to kill her. He argued it was not premeditated for those reasons, and that it was not felony murder because there was no robbery or burglary—Arnold never told Hernandez they were going to rob anyone and Arnold was the one who took the purse. While Stokes did not expressly concede second-degree murder, he did argue to the jury that they could consider lesser included offenses. He also argued that they might find the victim was killed when she was accidentally dropped, which would be manslaughter by culpable negligence. He argued lack of evidence, conflicts in the evidence, and the State's burden of proof.

In Stokes' rebuttal guilt phase closing argument, he disagreed with the State's argument that everything Arnold did could be attributed to Hernandez as a principal. He again contended that Tammy Hartman "hijacked" Hernandez's will when he was intoxicated on crack cocaine in order to get him to confess. Stokes reiterated many of the arguments he made in his first closing statement, and claimed that Tammy made Hernandez the "sacrificial lamb." Stokes also criticized Tammy's actions in talking to witnesses and gathering evidence, and said that when she first learned what Arnold told her, she should have just called the police. Stokes again argued that everything that transpired was attributable to Arnold.

At the evidentiary hearing, Stokes agreed that the guilt phase defense and strategy can have an effect on the penalty phase, but said, "My opinion was to go for it. I mean, I've had too many that came back with a lesser included. You know, you never know what a jury is going to do; and my opinion was that I agreed with Mr. Hernandez, that you shouldn't give up your right to a jury trial." Stokes testified in the evidentiary hearing that relative culpability was a big issue as it is in any multiple defendant case, and his primary strategy was to rebut any attempt to portray Hernandez as the more culpable. To support following this strategy, he cited evidence that the victim might have been killed by being smothered, which raised a question as to whether she was already dead when Hernandez stabbed her throat. Stokes agreed that his strategy was to raise enough doubts to convince the jury to come in with a lesser-included offense verdict. He said Tammy's bias was the primary focus of his trial strategy.

Hernandez contends that Stokes was ineffective in failing to concede second-degree murder, and that the defense presented in the guilt phase, which contested all the crimes charged, was incoherent and not credible, prejudicing the defendant in the penalty phase. Citing Florida v. Nixon, 543 U.S. 175 (2004), Hernandez argues that Stokes could have and should have conceded guilt to the crime charged or to a lesser included offense. The circuit court denied relief, finding that Stokes' guilt phase strategy was to contest all the crimes charged, and

to establish reasonable doubt in hopes of conviction for a lesser offense, and that Stokes and Rollo did discuss strategy before and during trial. Finally, the circuit court found Hernandez failed to show this strategy was unreasonable under the norms of professional conduct or that, but for counsel's strategy, the jury would have come back with a lesser offense conviction.

In Nixon, the facts showed that trial counsel attempted to explain the strategy of conceding the overwhelming evidence of guilt to Nixon several times but he was unresponsive, so trial counsel exercised his professional judgment to concede guilt and focus on the penalty phase. The Supreme Court in Nixon did not hold that trial counsel should, in every case in which the evidence of guilt is overwhelming, concede murder and focus only on the penalty phase. Id. at 181. Further, Nixon held "when a defendant, informed by counsel, neither consents nor objects to the course counsel describes as the most promising means to avert a sentence of death, counsel is not automatically barred from pursuing that course." Nixon, id. at 178. In the present case, Stokes concluded that, even though there was strong evidence against Hernandez, including a confession, the evidence was subject to challenge, and that he might be able to raise a reasonable doubt whether this murder was premeditated.

Further, there is no indication in the present case that Hernandez was unresponsive in discussions of guilt phase strategy, or that he did or did not object

to conceding guilt. Clearly, Hernandez exhibited a desire to have a jury trial on guilt when he disagreed with his first lawyer's advice to enter a plea, resulting in Stokes being appointed. Postconviction counsel failed to demonstrate that the strategy employed by Stokes—to challenge the evidence of all the crimes charged and to attempt to shift blame to Shawn Arnold—was not the strategy that Hernandez desired.

The circuit court was correct in denying relief on this claim. A reading of the closing argument given by Stokes discloses a clear strategy to place more culpability on Shawn Arnold—a strategy that was consistent with a penalty phase strategy that Hernandez should get a life sentence as did Arnold. The argument also shows a strong attack on the actions of the main prosecution witness, Tammy Hartman, in an attempt to show she was protecting Arnold at the expense of Hernandez. Stokes pointed out how she browbeat Hernandez, tampered with evidence, and gave a confused version of events in attempting to ascribe statements and actions to Hernandez. It was clear in her testimony that much of what she said may have been related to her by Arnold. Under the circumstances, this strategy, although not ultimately a successful one, appears reasonable under the norms of professional conduct and was not in conflict with the penalty phase strategy that showed Hernandez was a follower, not a leader, and had a serious drug abuse problem that was exacerbated by his association with Arnold.

Stokes was faced with strong evidence of guilt and attempted to place the worst of the evidence in such a light as to cast doubt on its reliability. Nothing Stokes said in closing argument would necessarily impair the credibility of the mitigation witnesses. Stokes argued in the guilt phase that Arnold was the ringleader who took all the major steps in the process that resulted in the victim's death. The mitigation evidence attempted to show that Hernandez was not a leader and suffered from post-traumatic stress disorder stemming from his abusive childhood—and that because of his childhood abuse, he would tend to disconnect from things happening around him. This was all consistent with the guilt phase case that portrayed Hernandez as being led by Shawn Arnold and manipulated by Tammy Hartman.

Moreover, contrary to what postconviction counsel argues here, Stokes did not deny that Hernandez was guilty of any crimes at all. Stokes did attempt to put all the evidence into a scenario showing that Hernandez had no premeditated intent to kill the victim, that he did not go there with any intent to rob the victim, that Arnold was the one who robbed the victim as an afterthought, and that Hernandez's actions may not even have been the actions that resulted in the victim's death. Stokes did ask the jury to consider lesser offenses. He asked if the evidence was consistent with a depraved mind, suggesting second-degree murder. He asked the jury to consider manslaughter by culpable negligence, arguing that

the victim's neck may have been broken when she was accidentally dropped while being moved her after Hernandez thought she was already dead. None of these arguments conflicted with any of the mitigation presented by penalty phase counsel. We agree with the postconviction court that Stokes was not ineffective in his choice of trial strategy and that his guilt phase strategy was not conflict with the penalty phase strategy in this case.

## Admissibility of Trial Counsel's Disciplinary Record

Hernandez next contends that the circuit court erred in refusing to admit trial counsel Ted Stokes' professional disciplinary history in order to support allegations that Stokes' performance was deficient in this case and to support the contention that penalty phase counsel was unjustified in relying on Stokes as lead guilt phase counsel. The disciplinary cases that Hernandez sought to admit, and which were proffered, consisted of disciplinary orders of this Court entered in 1992 (two matters), 1994, 2001 (two matters), and 2005.[13] The discipline was imposed for Stokes' failure to file notices of appeal in two criminal cases, failure to maintain a law office trust account and trust account records, failure to timely file documents in a probate matter and failure to properly communicate with the client,

---

13. The Florida Bar v. Ted A. Stokes, Case Number 77,030; The Florida Bar v. Ted Alan Stokes, SC82,636; The Florida Bar v. Ted Alan Stokes, SC00-71; The Florida Bar v. Ted Alan Stokes, SC04-424.

failure to file a petition for adoption for which he was retained, and failure to properly investigate and diligently represent a defendant in a criminal case.[14]

The State contends that the circuit court properly excluded the orders because the disciplinary proceedings and orders are not relevant to Stokes' or Rollo's performance in this instant case, where the issue is ineffective assistance of trial counsel. In a different context, we have held that it was in the trial court's discretion to prevent cross-examination of the State's expert witness about his examination of a defendant in a different case in which we found the expert rendered an incompetent medical evaluation. The earlier finding was considered a "collateral matter." See Cruse v. State, 588 So. 2d 983, 988 (Fla. 1991). We cautioned in Cruse that allowing such earlier finding into evidence would turn the trial into a battle over the merits of the prior ruling. Id. Similarly, in Secada v. Weinstein, 563 So. 2d 172 (Fla. 3d DCA 1990), that court cautioned that allowing prior collateral findings might have "the inevitable tendency of causing the jury in

_____

14. Stokes' representation was also discussed in Coleman v. State, 64 So. 3d 1210 (Fla. 2011), where the jury recommended life but sentences of death were imposed. Stokes failed to retain an investigator or obtain a mental health evaluation of the defendant, and relied solely on the defendant's alibi defense. Id. at 1219. Evidence presented in postconviction showed that the defendant had an impoverished background, poor relationship with his father, loss of family members, special education, substance abuse, head injury, and mental illness. Counsel could have presented this mitigation to the judge to support the life sentence recommended by the jury; thus, we vacated the death sentences and remanded for life in prison.

the present case to defer to decisions made in a previous one." Id. at 173. The federal district court in Moore v. Chrones, 687 F. Supp. 2d 1005, 1030 n.13 (C.D. Cal. 2010), held that "the relevant inquiry on an ineffective assistance claim is whether counsel's performance was deficient and caused prejudice in connection with the particular defendant and trial in issue, not what occurred in other cases."

Because the admission of these prior disciplinary orders was a matter within the trial court's discretion, and was not directly relevant to Stokes' and Rollo's performance in representing Hernandez in this case, the circuit court did not err in sustaining the State's objection. Further, such matters are not the proper subject for impeachment under section 90.608, Florida Statutes (2007). That provision allows impeachment with prior inconsistent statements, evidence of bias, evidence of defect of capacity, ability, or opportunity to observe, remember, or recount matters, and proof by other witnesses that material facts are not as testified to by the witness being impeached. Section 90.608(3) allows impeachment of the character of the witness by evidence of character relating to truthfulness under section 90.609(1), Florida Statutes, and relating to evidence of certain crimes under section 90.610, Florida Statutes. None of these provisions are met in the evidence of Stokes' prior disciplinary history to require admission of the disciplinary history. For all these reasons, the trial court did not abuse its discretion in excluding evidence of Stokes' disciplinary history.

**Trial Counsel's Performance Regarding Victim Impact Evidence**

Hernandez next contends that although penalty phase counsel filed a pretrial motion to exclude all victim impact evidence from the jury, he was deficient in not objecting to any specific victim impact testimony. The United States Supreme Court held in Payne v. Tennessee, 501 U.S. 808 (1991), that the State may introduce victim impact evidence in the sentencing phase of trial to show "each victim's 'uniqueness as an individual human being,' whatever the jury might think the loss to the community resulting from [her] death might be." Id. at 823. We have held that "[t]he admission of victim impact evidence is protected by article I, section 16, of the Florida Constitution, and is also specifically governed by section 921.141(7), Florida Statutes." Kalisz v. State, 124 So. 3d 185, 211 (Fla. 2013). That statute provides that once evidence has been admitted to show the existence of one or more aggravating circumstances, the prosecution may introduce evidence "designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death." § 921.141(7), Fla. Stat. (2007).

The victim impact evidence presented by the State consisted of testimony of two of Ruth Everett's friends, Elaine Simpson and Judy Morrissey. Simpson testified that she met Ruth Everett in 1966 or 1967 and remained friends until her death in 2004. She said that Everett was a hard worker and could be counted on,

was quiet and helpful, and enjoyed family get-togethers for birthdays and holidays. Everett checked on family and friends when they were sick or bereaved and always gave help when it was needed. Simpson explained that Everett's son James died at age sixteen, leaving her son David as her only relative in the area. Defense counsel did object when Simpson testified that Everett had sadness in her life and had experienced a bad marriage. He also objected to testimony by Simpson that Everett's death was a loss because she was like a family member, and Simpson's life is now "like a fabric with a hole ripped in it." Simpson testified that Everett was encouraging to her, and was a "support system" when Simpson had to care for her mother for almost ten years.

Simpson also testified that Everett's loss to the community was large—she paid her taxes, worked hard, and took care of her son. Simpson concluded, "She had what most people would consider a small life, but it was in no way an unimportant life, when you think of how many lives her life touched and the fact that she was so humble with her own problems." On cross-examination, Simpson agreed that Ruth Everett "was very concerned about [David's] ongoing drug dealing and drug-using activities . . . ." After Simpson's testimony, the trial court instructed the jury that the evidence of the victim's "uniqueness" and the "loss to the community members," including her family, by her death is not to be considered as an aggravating circumstance.

The State also presented the testimony of Judy Morrissey, who had known Everett for about twenty-seven years, and lived in the same neighborhood for about twelve years before Everett's death. Morrissey had a close friendship with Everett and visited with her almost every day. She said they were more like family than just friends. Everett worked in retail and day care, where she was a very sweet, loving lady who grew attached to the children. Morrissey said Everett was a big part of the lives of Morrissey's own children, and was involved in church and enjoyed gospel music. Morrissey explained, "It's like a loss of a family member. She was a very, very close friend. She was a very big part of my day-to-day life." In cross-examination of Morrissey, she said the victim was concerned about her son's drug-related activities.

Hernandez contends that counsel's failure to object to victim impact evidence about Ruth Everett's difficult life, the fact that her son James died at age sixteen, and that she had been good to a friend's parents constituted deficient performance by penalty phase counsel. Hernandez contends that evidence that the victim was a hard worker, and a good citizen who paid taxes and voted was not relevant to her uniqueness or to her loss to the community and was outside the scope of section 921.141(7), Florida Statutes. He also argues that some of the testimony related events that occurred years before the murder and thus could not be relevant to any current loss. The postconviction court denied this claim, finding

that some of the testimony was objected to by penalty phase counsel, and that

counsel's lack of objection to other testimony, such as the fact that the victim was

concerned about her son's drug dealing, was not deficient performance because

that evidence was in accord with the defense theory of the case.  Hernandez does

not contend that this victim impact evidence was unduly voluminous or became a

feature of the trial.  Instead, he contends that it is not the type of evidence that is

permitted by section 921.141(7) and thus is not relevant and should have been

objected to by counsel.  As can be seen, counsel did object to several areas of

victim impact evidence.  Moreover, the victim impact evidence in this case was

proper under section 921.141(7) and under the precedent of the United States

Supreme Court and this Court.

We held in Franklin v. State, 965 So. 2d 79, 97 (Fla. 2007), that victim

impact evidence that the victim's friends were "hurt pretty bad" by the loss, that

the victim served in the U.S. Army in Vietnam, was loving and generous and

helped family and friends, and was a good guy who helped neighborhood children

was all within the purpose of section 921.141(7) to demonstrate the uniqueness of

the victim and loss to the community.  Franklin, 965 So. 2d at 97-98.  In Victorino

v. State, 127 So. 3d 478, 496 (Fla. 2013), we found victim impact evidence that the

victim's family members were grieving was proper.  We have also held that

evidence the victim, long before his death, was a police officer who tried to help

others and had been a U.S. Army Paratrooper demonstrated the uniqueness of the victim.  Peterson v. State, 94 So. 3d 514, 530 (Fla. 2012).  Thus, the fact that the victim possesses characteristics or experience similar to that of others does not defeat a showing of the uniqueness of the particular victim at issue.  Further, the fact that some of those characteristics were demonstrated in the past does not defeat the purpose of the victim impact statute.

Here, Ruth Everett was described as extremely helpful to friends and their families, loved caring for children, and would be missed.  This was exactly the type of testimony that demonstrated her particular characteristics and thus her uniqueness, as well as the loss to the community occasioned by her death.  Evidence that she suffered sadness and losses in a difficult life was proper because it demonstrated her unique ability to think and act positively with her friends and her community in spite of her own personal difficulties.  The sum total of these personal characteristics is what illustrates Everett's uniqueness and the loss to the community and to the people who relied on and were helped by her.

We explained in Bonifay v. State, 680 So. 2d 413, 420 (Fla. 1996), that "[f]amily members are unique to each other by reason of the relationship and the role each has in the family."  This same characterization applies to the relationship between the victim and her closest friends, who described Everett as being more "like family."  Because the victim impact evidence in this case was not a focus of

the penalty phase, was not voluminous, and was relevant and proper within the confines of section 921.141(7), penalty phase counsel was not deficient in failing to make more specific objections to the evidence. The postconviction court correctly denied this claim.

## PETITION FOR HABEAS CORPUS

Claims of ineffective assistance of appellate counsel are appropriately raised in a petition for writ of habeas corpus, as Hernandez has done in this case. See Jackson v. State, 127 So. 3d 447, 476 (Fla. 2013). The alleged error by appellate counsel must be of "such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance. . . ." Id. (quoting Pope v. Wainwright, 496 So. 2d 798, 800 (Fla. 1986)). Further, the deficiency must have "compromised the appellate process to such degree as to undermine confidence in the correctness of the result." Id. (quoting Pope, 496 So. 2d at 800). We have held many times that "appellate counsel cannot be deemed ineffective for failing to raise nonmeritorious claims on appeal." Id. (quoting Freeman v. State, 761 So. 2d 1055, 1070 (Fla. 2000)). "The reviewing court must presume that [appellate] counsel's conduct was within the broad range of reasonable professional conduct, and the defendant bears the burden of overcoming this presumption." Conahan, 118 So. 3d at 733. The standard of

review for claims of ineffective assistance of appellate counsel "mirrors the Strickland standard for ineffective assistance of trial counsel." Id. at 732.

Hernandez contends that appellate counsel was ineffective in failing to raise on appeal a preserved claim of error concerning the trial testimony of Dr. Harry McClaren, who was called by the State to testify in the penalty phase of trial. Hernandez contends that Dr. McClaren made a misstatement of law concerning what mental conditions might rise to the level of the statutory mitigating circumstance that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance. See § 921.141(6)(b), Fla. Stat. (2007). Hernandez contends that Dr. McClaren suggested that only psychosis or insanity proves that statutory mental health mitigator. Hernandez is correct that "sanity does not eliminate consideration of the statutory mitigating factors concerning mental condition," Mines v. State, 390 So. 2d 332, 337 (Fla. 1980), and the two concepts should not be confused, see Coday v. State, 946 So. 2d 988, 1003 (Fla. 2006). However, we find that appellate counsel was not deficient in failing to raise on direct appeal a claim that Dr. McClaren's testimony concerning the statutory mental health mitigator was an incorrect statement of law.

Dr. McClaren, a psychologist specializing in criminal forensic psychology, evaluated Hernandez prior to trial by meeting with him for about four hours. In the evaluation, Hernandez also told Dr. McClaren he was drunk and high on crack

cocaine when the murder occurred. Dr. McClaren investigated Hernandez's background and reviewed results of psychological tests. He also reviewed "voluminous documents" relevant to Hernandez's past behavior, including witness reports, jail medical records, records from California, and the incident for which Hernandez was on trial. Dr. McClaren administered a number of psychological tests to Hernandez, and reviewed results of some testing performed by defendant's expert, Dr. Brett Turner, that showed Hernandez appeared to be malingering.

Dr. McClaren testified at trial that he found Hernandez suffered from post-traumatic stress disorder resulting from his abusive childhood, had some form of depression, and suffered polysubstance abuse involving crystal methamphetamine, crack cocaine, and marijuana. He also diagnosed Hernandez with antisocial personality disorder and borderline personality disorder—and opined that Hernandez may have a cognitive disorder not otherwise specified. Dr. McClaren noted that these diagnoses were consistent with those given by the defense experts at trial. In Dr. McClaren's opinion, Hernandez was not under extreme mental or emotional disturbance at the time of the murder, but was intoxicated by cocaine. When he was asked to give an example of an extreme mental or emotional disturbance, Dr. McClaren responded, "A person . . . suffering from psychosis, a break from reality, experiencing delusions, false beliefs that someone was poisoning him, controlling him with witchcraft, voodoo, cosmic rays, hearing

voices or seeing things that were scaring him, urging him to do things that were wrong to the extent - - " At this point, defense counsel Rollo objected in part that the "State is raising the issue of an insanity defense to knock it down. We've never raised it, and that's what we are talking about here. So this isn't relevant to anything that we've brought up. Any mitigation whatsoever." Counsel subsequently argued, "There's nothing in the [statutory] mitigator that says anything about psychosis, and that's what he's describing. We haven't attempted to establish that." The trial court overruled the objection, concluding it was an issue that went to the weight of the testimony and not admissibility.

Dr. McClaren then continued to give more examples of conditions that he believed would rise to the level of the statutory mitigator, describing "[s]omeone who is suffering from a major depression, a postpartum depression, the various kinds of brain injuries that very significantly affect impulse control, these sorts of things, are the kinds of things that I would associate with extreme mental or emotional disturbance." Dr. McClaren also testified that an extreme emotional disturbance could arise when a person observes traumatic or shocking events. We conclude that Dr. McClaren did not make a misstatement of law concerning what diagnoses or conditions would qualify as proof of the statutory mitigator.

First, it can be seen from Dr. McClaren's full testimony that he did not limit his description of what diagnoses might rise to the level of extreme mental or

emotional disturbance to psychosis, as Hernandez now contends. Dr. McClaren expanded the list of examples from psychosis and delusions to include a number of other diagnoses and circumstances that, in his opinion, could meet the standard for the statutory mitigator. Thus, Hernandez's first premise—that Dr. McClaren was testifying that only insanity or psychosis rises to the level of extreme mental or emotional disturbance—is incorrect. Second, Dr. McClaren simply did not believe Hernandez's cocaine intoxication or addiction in this case was a condition or circumstance that rose to the level of the statutory mitigator. On cross-examination, Dr. McClaren conceded he was not testifying that it is impossible that Hernandez could meet the statutory criteria, just that he disagreed with the defense experts on this point.

In rejecting the finding of the statutory mitigator in this case, the trial court did not cite Dr. McClaren's testimony concerning psychosis as the only condition meeting the requirements of the statute. Furthermore, the trial court found that Dr. McClaren testified that Hernandez's cocaine intoxication "did cause a lesser degree of mental (but not emotional) disturbance" and recognized that Hernandez suffered from post-traumatic stress disorder, depressive disorder, polysubstance abuse, antisocial personality disorder, borderline personality disorder, impulse control disorder, cognitive disorder, and possible brain damage. The trial court stated, "Considering the expert testimony combined with the other evidence

presented in this case, the Court finds insufficient evidence to support the existence of these two mitigating circumstances," but did conclude that the cocaine intoxication was proven and would be considered in the nonstatutory mitigation section of the order. We conclude that the claim, if raised on appeal, would have been found meritless. Even if the claim could have had some possibility of success, "appellate counsel is not 'necessarily ineffective for failing to raise a claim that might have had <u>some</u> possibility of success; effective appellate counsel need not raise <u>every conceivable</u> nonfrivolous issue.' " <u>Zack v. State</u>, 911 So. 2d 1190, 1204 (Fla. 2005) (quoting <u>Valle v. Moore</u>, 837 So. 2d 905, 908 (Fla. 2002)). Finally, our confidence in the result of the appeal is not undermined by counsel's failure to raise this claim. For these reasons, the petition for writ of habeas corpus alleging ineffective assistance of appellate counsel must be denied.

## CONCLUSION

For all the foregoing reasons, the order of the circuit court denying postconviction relief is hereby affirmed, and the petition for writ of habeas corpus is denied.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, and PERRY, JJ., concur.
CANADY, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

<u>Two Cases:</u>

An Appeal from the Circuit Court in and for Santa Rosa County,
David Harold Rimmer, Judge - Case No. 572004CF001184XXAXMX
And an Original Proceeding – Habeas Corpus

Curtis Mitchell French, Tallahassee, Florida,

for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, and Charmaine Millsaps, Assistant Attorney General, Tallahassee, Florida,

for Appellee/Respondent